**EARL EVANS CHEVROLET, INC. et al., Appellees and Cross–Appellants,**

v.

**GENERAL MOTORS CORPORATION, Appellant and Cross–Appellee, et al.**

[Cite as *Earl Evans Chevrolet, Inc. v. Gen. Motors Corp.* (1991), 74 Ohio App.3d 266.]

Court of Appeals of Ohio,
Lake County.

No. 90–L–14–001.

Decided May 28, 1991.

*Richard M. Markus; Nicholas M. DeVito & Assoc.* and *Nicholas M. DeVito,* for appellees and cross-appellants.

*Morganstern & MacAdams Co., L.P.A.,* and *Stanley Morganstern,* for appellee Daniel Nester.

*Jones, Day, Reavis & Pogue, Patrick F. McCartan, Hugh R. Whiting* and *Paul T. Cappuccio,* for appellant and cross-appellee.

FORD, Judge.

In the summer of 1982, appellees Daniel Nester and Earl Evans Chevrolet, Inc. ("Evans") initiated an action against appellant General Motors Corporation alleging, *inter alia,* that General Motors ("GM") violated the Ohio Motor Vehicle Dealer Act, R.C. 4517.01 *et seq.* By the time the case went to the jury, the scope of the action had been pruned to two specific statutory violations: (1) a charge that GM had failed to act in "good faith" in its dealings with Evans, a violation of R.C. 4517.01(A); and (2) an allegation that GM discriminated against Evans in the allocation of vehicles, a violation of R.C. 4517.01(F).

Special interrogatories answered by the jury established that the jurors concluded that GM violated both R.C. 4517.59(A) and 4517.59(F). Based upon these violations, the jury returned a general verdict in favor of appellees in the amount of $5,274,800. Both sides moved for post-trial relief. After hearing all of the post-trial motions, the trial court doubled the damages pursuant to R.C. 4517.65(A) to the amount of $10,549,600, and had taxed costs to GM in the amount of $3,392.16.

The record reflects that Evans began operation in 1954 in Painesville, Ohio, as an authorized Chevrolet dealer. In 1969, Evans hired appellee Daniel Nester, and by 1974, Nester had become general manager. A year later, Nester purchased a ten percent interest in the dealership and acquired complete control of its day-to-day operations. Over the next several years, Nester acquired additional equity in Evans. As of February 1980, Nester had acquired 55.3 percent of the dealership stock, and was listed on the dealership agreement as the owner and operator. Finally, in the spring 1981, Nester purchased the remaining shares of Evans, becoming its sole shareholder.

The seeds of the present controversy are traced to 1976 when Nester learned that GM was considering filling a vacant slot in the Cleveland Multiple Dealer Area ("Cleveland MDA") by opening Classic Chevrolet ("Classic") in

Mentor, Ohio. Because Nester felt that the establishment of a new dealership within such a close proximity would prove detrimental to Evans's business, Nester actively opposed the creation and location of the Classic dealership by attempting to block a required zoning variance. Despite Nester's protestations, the Classic dealership was scheduled to open in June 1979.

Classic did not open its doors for business in June 1979 as scheduled. Rather, because of unexpected construction delays, Classic was forced to commence operations on August 4, 1979. There is no dispute between the parties that Classic opened with a larger than normal inventory of vehicles, and that Evans began to experience a shortage of highly desirable vehicles.

During the period in question, 1979 to 1981, the retail car industry was encountering a drastic shift in demand from larger automobiles, to smaller, sports and fuel-efficient models. Specifically, the most desirable Chevrolet models were the Citations, Cavaliers, and Monzas. However, these vehicles were in very short supply, and many dealers were having difficulty in acquiring these models.

Appellees had alleged that GM failed to act in "good faith," and discriminated against Evans in the allocation of these high-demand vehicles. Thus, according to appellees, it became impossible for Evans to retain its competitive eight-week sales history to earn sufficient vehicles, and this "starvation" led to the dealership's ultimate demise during the winter of 1980 to 1981.

Reserving our discussion of the specific acts alleged to be violative of the Ohio Motor Vehicle Dealer Act until our treatment of the second and third assignments of error, we turn our attention to the first assignment of error, where appellant GM maintains that:

"The trial court erred to GM's prejudice in instructing the jury on the definition of 'good faith' under the Dealer Act, and in denying the GM new trial motion based on this erroneous instruction."

The Ohio Motor Vehicle Dealer Act in effect at the time of the alleged conduct defined "good faith" as follows:

" 'Good faith' means the duty * * * to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party * * *." R.C. 4517.01(BB).

However, over GM's objection, the trial court instructed the jury to apply the definition of "good faith" as it appeared in the 1987 amendments to the Act, which provided, in pertinent part:

" 'Good faith' means honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade

as is defined in division (S) of section 1301.01 of the Revised Code, including but not limited to the duty to act in a fair and equitable manner so as to guarantee freedom from coercion, intimidation, or threats of coercion or intimidation * * *." R.C. 4517.01(BB).

■ In order to ascertain whether the trial court erred to GM's prejudice in giving the 1987 amendment's definition of "good faith," this court must separately address two distinct issues. First, we must determine whether the General Assembly intended to give the 1987 definition of "good faith" retroactive effect. If retroactive application was not intended, we must then determine whether GM was prejudiced by the erroneous instruction.

With respect to the issue of retroactivity, we begin by noting the well-established principle in Ohio that "[a] statute is presumed to be prospective in its operation unless *expressly* made retrospective." (Emphasis added.) R.C. 1.48; see, also, *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 106, 522 N.E.2d 489, 496. In the instant case, the last sentence of R.C. 4517.59 under the 1987 amendments states:

*"This section applies to any franchise whether entered into prior to or after the effective date of this amendment."* (Emphasis added.)

This statement does not express an intent to apply the strictures of the 1987 version of R.C. 4517.59 to *conduct* predating the amendment. Rather, the only clear expression of intent to be gleaned from these words is that *no franchise entered into prior* to the effective date of the amendment can escape the *prospective* application of the rule. See *Van Fossen, supra.* In other words, it applies prospectively to all existing franchises. Accordingly, we hold that the definition of "good faith" under the 1987 amendment, R.C. 4517.01(BB), does not apply to conduct or transactions predating the effective date of the amendment.

■ Having determined that the trial court erred by instructing the jury on an inapplicable definition of "good faith," we must now determine whether such instruction constitutes reversible error.

Where a party establishes that the law was not clearly and fairly represented to the jury, and that he was prejudiced thereby, a reversal may be justified. Cf. *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585; *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 8, 19 OBR 71, 73, 482 N.E.2d 955, 959. In the case *sub judice*, General Motors filed its motion for post-trial relief, based, in part, upon the erroneous instruction. The trial court conceded that it had erroneously instructed the jury, but asserted that GM was not prejudiced because of a "modified approach" to the two-issue rule:

"The jury being improperly instructed on the more liberal definition of 'good faith,' retroactive effect was given to the statute and this is error.

"The next question which must be answered is, is the error prejudicial? The jury, in answer to interrogatories found that the defendant [GM] had not acted in good faith and had discriminated in allocation of automobiles. The jury awarded damages. *Though this is not precisely the two issue rule, the jury could have awarded damages on either or both issues and the defendant is not prejudiced and the error was harmless.*" (Emphasis added.)

The two-issue rule originated in *Sites v. Haverstick* (1873), 23 Ohio St. 626, and was recently cited with approval in *Pulley v. Malek* (1986), 25 Ohio St.3d 95, 25 OBR 145, 495 N.E.2d 402. The rule has been defined as follows:

" ' * * * [E]rror in the charge of the court dealing exclusively with one of two or more complete and independent issues required to be presented to a jury in a civil action will be disregarded, if the charge in respect to another independent issue which will support the verdict of the jury is free from prejudicial error, *unless it is disclosed by interrogatories or otherwise that the verdict is in fact based upon the issue to which the erroneous instruction related.*' *Bush v. Harvey Transfer Co.* (1946), 146 Ohio St. 657 [33 O.O. 154, 67 N.E.2d 851], paragraph three of the syllabus." (Emphasis added.) *Pulley, supra*, 25 Ohio St.3d at 97, 25 OBR at 147, 495 N.E.2d at 404.

Restated, the rule will generally be applied " * * * where there are two causes of action or two defenses, thereby raising separate and distinct issues, and a general verdict has been returned, *and the mental processes of the jury have not been tested by special interrogatories to indicate which of the issues was resolved in favor of the successful party * * *.*" (Emphasis added.) *H.E. Culbertson v. Warden* (1931), 123 Ohio St. 297, 303, 175 N.E. 205, 207.

Based upon the cited authority, we conclude that the two-issue rule is literally inapplicable where, as in this case, the mental processes of the jury were tested by special interrogatories indicating that both issues were resolved in favor of appellees. Here, the jury was presented with *separate* interrogatories regarding the claim of failure to act in good faith under R.C. 4517.59(A), and the claim of discriminatory allocation under R.C. 4517.59(F). The jury found GM to be in violation of both statutory provisions. Thereafter, the jury returned a general verdict in favor of appellees in the amount of $5,274,800. Accordingly, the two-issue rule is inapplicable under this scenario.

Having negated the use of the two-issue rule in the instant case, we must nevertheless determine whether GM was prejudiced by the erroneous jury instruction. We conclude that GM was not prejudiced for two reasons.

First, the interrogatories establish that the jury found liability under R.C. 4517.59(F), a provision unchallenged under this assignment. Hence, *that* verdict is still sustainable, and under the unique circumstances of this case, the damage evidence presented would have supported the entire award under either theory. Although, as the trial court posited, the two-issue rule is literally inapplicable, the result obtained here is substantially analogous to what would obtain if the rule were applicable.

Second, we conclude that there is no substantive difference between the appropriate definition of "good faith" which was in effect at the time of the alleged conduct and the 1987 amendment's definition of "good faith" which was erroneously given to the jury.

According to GM, the new definition of "good faith" "completely changes the standard of conduct prohibited by R.C. 4517.59(A) by adding to it a focus on 'honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade.'" In this regard, GM asserts that the 1987 definition "broadened" the statute, by creating a generalized good faith standard, as contrasted to the *specific* showing of "coercion, intimidation, or threats of coercion or intimidation" required by the former definition.

GM is correct in its assertion that under the definition of "good faith" in effect at the time of the alleged conduct, there could be no recovery under the Ohio Motor Vehicle Dealer Act absent a showing of coercion, intimidation, or threat of coercion or intimidation. Significantly, however, "coercion" was defined as follows:

"'Coerce' means the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of the franchise or agreement * * *." R.C. 4517.01(CC).

Based upon this liberal definition of "coercion," we conclude there to be no *substantive* change in the standard to be applied to the jury in the instant case. Accordingly, GM has failed to demonstrate any prejudice created by the erroneous jury instruction, and the first assignment is without merit.

■■■ In its second and third assignments of error, which shall be treated in a consolidated fashion, GM assigns that:

"The trial court erred in overruling the GM motions for directed verdict and for judgment notwithstanding the verdict on plaintiffs' claim[s] that GM violated Ohio Rev.Code Section 4517.59(A) * * * [and] 4517.59(F)."

GM asserts that appellees' "theories," or allegations of misconduct, are legally insufficient to sustain the claims under the Ohio Motor Vehicle Dealer

Act, and it was therefore entitled to a directed verdict or judgment notwithstanding the verdict. We disagree.

Under R.C. 4517.59(A), a dealer may bring a cause of action against an automobile manufacturer for failure to act in good faith "[i]n acting or purporting to act under the terms, provisions, or conditions of a franchise."

The statutory definition of "good faith" in effect at the time of the alleged conduct required that both parties to a franchise "act in a fair and equitable manner toward each other so as to guarantee the one party freedom from *coercion,* intimidation, *or threats of coercion* or intimidation from the other party * * *." (Emphasis added.) R.C. 4517.01(BB). This definition is identical to the definition of "good faith" found in the Federal Automobile Dealers' Franchise Act, known more colloquially as the Automobile Dealers' Day in Court Act, Section 1221 *et seq.,* Title 15, U.S.Code.

There is, however, a functional difference between the Ohio and federal Acts with respect to the definition of "good faith." While both Acts require a showing of "coercion or intimidation," the Federal Automobile Dealers' Day in Court Act fails to define these terms. Conversely, the Ohio Motor Vehicle Dealer Act, as it was in effect at the time of the alleged conduct, defined coercion as: " * * * the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of the franchise or agreement; provided however, that recommendation, exposition, persuasion, urging or argument shall not be considered to constitute a lack of good faith." R.C. 4517.01(CC).

Under the federal Act, a lack of good faith, or bad faith, has been narrowly defined and strictly construed. *Carroll Kenworth Truck Sales v. Kenworth Truck Co.* (C.A.11, 1986), 781 F.2d 1520, 1525. The federal courts have held that bad faith "does not mean simply a lack of fairness but entails a showing of coercion," *id.,* and that "coercion or intimidation must include 'a wrongful demand which will result in sanctions if not complied with.' " *Fray Chevrolet Sales, Inc. v. Gen. Motors Corp.* (C.A.6, 1976), 536 F.2d 683, 685.

In the absence of any statutory definition, the federal courts have decided to attach the common, ordinary meaning to "coercion." However, the Ohio legislature chose to define coercion as "the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of the franchise or agreement." This is clearly a different standard of conduct.

R.C. 1.11 is perhaps the most elucidating provision concerning the construction of "good faith" and "coercion." R.C. 1.11 states:

*"Remedial laws and all proceedings under them shall be liberally construed* in order to promote their object and assist the parties in obtaining

justice. *The rule of the common law that statutes in derogation of the common law must be strictly construed has no application to remedial laws;* but this section does not require a liberal construction of laws affecting personal liberty, relating to amercement, or of a penal nature." (Emphasis added.)

In *Car Business, Inc. v. Fleetwood Motor Homes of Indiana, Inc.* (1985), 23 Ohio Misc.2d 40, 23 OBR 433, 492 N.E.2d 488, a court of common pleas had the occasion to construe the definition of "franchise" under R.C. Chapter 4517. The court noted:

"The term 'remedial statute' is applied to Acts relating to the remedy as distinguished from those relating to substantive rights. The Supreme Court of Ohio has acknowledged that it is doubtful if a perfect definition of remedial law could be devised. *State ex rel. Holdridge v. Indus. Comm.* (1967), 11 Ohio St.2d 175 [40 O.O.2d 162, 228 N.E.2d 621]. However, *most courts agree that remedial law prescribes methods of enforcement of rights or of obtaining redress. Id. Thus, R.C. Chapter 4517, which sets forth remedies and means of recovery for franchisees who have been mistreated by their franchisors,* including the definition of franchise contained in R.C. 4517.01(V), *is remedial and is therefore to be liberally construed* to promote said remedies and means." (Emphasis added.) *Id.,* 23 Ohio Misc.2d at 42, 23 OBR at 436, 492 N.E.2d at 491.

We agree with this analysis regarding the remedial nature of R.C. Chapter 4517. Liberally construing, therefore, "good faith" and "coercion," we hold that to establish a violation of R.C. 4517.59(A), it is sufficient to show that a manufacturer, outside the ordinary course of business, withheld or delayed delivery, or threatened to withhold or delay delivery of scarce vehicles from a dealer. Such a showing would also establish a violation of R.C. 4517.59(F).

 GM contends that the trial court erred in refusing to grant its motions for directed verdict and judgment n.o.v. on the ground that there was insufficient evidence for the jury to conclude that GM violated either R.C. 4517.59(A) or (F).

" 'The test to be applied by a trial court in ruling on a motion for a judgment notwithstanding the verdict is the same test to be applied on a motion for directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. *Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the*

*motions.'* " (Emphasis added.) *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511, 514.

We find that appellees produced more than a mere "scintilla" of evidence upon which reasonable minds could differ on these pivotal issues. Accordingly, the evidence, if believed, was both sufficient to create a jury question, and to support the resulting verdict.

Testimony presented at trial established that the root of conflict between the parties began with Nester's opposition to the proposed opening of Classic Motors. Nester testified that during this period a GM official approached him at a local auto show and instructed him to stop opposing the Classic project. Nester also testified that a GM zone manager instructed Nester to remove a Citation from the Euclid Mall where it was on display, and that if Nester did not comply, the zone manager would limit Nester's receipt of Citations in the future.

Appellees assert that this original confrontation blossomed into subsequent acts designed to "starve" Evans of smaller, fuel-efficient models. According to appellees, by withholding and delaying delivery of these models out of the ordinary course of business, GM implemented a discriminatory allocation scheme, with the intended result being the eventual termination of the Evans dealership.

GM maintains that the only relevant evidence established by appellees in the instant case was proof that Classic received more of the high-demand vehicles than Evans, and that this fact without more is insufficient to create a statutory violation. While we agree that a disparity in the number of cars received, standing alone, would be insufficient to create a statutory violation, appellees' evidential submissions, if believed, have the effect of attributing the disparity to inequitable conduct outside the ordinary course of business.

Without addressing each point raised by the parties, we now turn to an examination of some of the more material conduct specifically alleged to be violative of the Act.

Appellees' expert testified that Classic opened its doors with an opening inventory which was two hundred percent larger than the normal sixty-day supply of vehicles. The expert concluded the larger inventory was out of the ordinary course of business, and that this discriminatory preference gave Classic an unfair competitive advantage which undermined Evans's sales performance. However, GM responds that this was not out of the ordinary course of business and was not occasioned by any bad faith or discriminatory intent.

According to GM, Classic was scheduled to open in May 1979. However, due to unexpected construction delays, Classic did not begin operations until August. Under these facts, two orders coincided: Classic's "opening inventory" order, and its "build out" order. GM explained that it typically shuts down its Chevrolet assembly lines in early July for retooling and orders are no longer accepted for the current year vehicles. Accordingly, GM requires dealers to place orders in early June to "build out" their inventories to cover their needs for a three- or four-month period following the annual shutdown until the next year's models can be stocked. GM argues that in the case of Classic, orders for its opening inventory coincided with "built out" orders. Therefore, because Classic did not open until August, it received both shipments at the same time, thus doubling its "opening inventory."

Regardless of the "coinciding" nature of the orders, nothing in the record establishes that filling the two orders *at the same time* was in the ordinary course of business. Based upon the testimony given by Nester, demonstrating the existing animus, and the expert testimony stating that a "doubled" starting inventory was not in the ordinary course of business, it is readily apparent that reasonable minds could come to different conclusions.

After challenging GM's conduct regarding Classic's opening inventory, appellees assert that GM violated its own "entitlement" process. The record demonstrates that, in light of the large inventory and brisk opening sales, Classic earned a substantial "entitlement" under the GM allocation system.

Under the GM system of allocation, an established dealership receives vehicles based upon "entitlement." The number of vehicles a dealer is entitled to purchase in a given week is based upon his eight-week sales history. In other words, the better dealers, *i.e.*, those who have been more successful at moving a particular vehicle, will generally be entitled to receive more of that model. However, a dealer will only receive the number of cars ordered, and must therefore maintain a full and balanced "order bank" to insure himself of his full entitlement.

The record reveals that Classic took advantage of its entitlement as it maintained a full and balanced order bank, while Evans often did not order its full entitlement. Accordingly, some of the vehicles (*i.e.*, sales) Evans' claims to have lost to Classic were a direct result of Nester's failure to place proper orders.

While GM may have provided the jury with substantial documentation tending to establish that it had abided by the "letter" of its system of allocation, appellees provided the factfinders with more than a mere scintilla of evidence that the "spirit" of the dealership agreement was broken. Although appellees focused on several aspects of GM's conduct tending to

support their claims, one facet manifests significant evidential import—the substantial disparity in order response time.

Nester's testimony reveals that Classic enjoyed a substantial advantage in order response time. In other words, when orders for vehicles were placed, GM would respond by delivering product much more swiftly to Classic than to Evans. Nester's testimony demonstrates the following comparable response times with regard to smaller, fuel-efficient models, and the alleged impact the delay had on Evans's "competitive entitlement" to future allocations:

| | Order Response Time/Days | | |
| Model | Classic | Evans | Disadvantage |
|---|---|---|---|
| Monzas (1979–1980) | 42 | 78 | 64 percent |
| Chevettes (1980–1981) | 71 | 96 | 45 percent |
| Cavaliers (1981) | 49 | 124 | 134 percent |

Nester testified that the delay in order response time caused cancellation of Evans's orders because of the unavailability of product. Moreover, Nester testified that this problem would be perpetuated as fewer sales in one period would cause Evans's entitlement to decrease in the next sales period. While GM offered testimony demonstrating that certain orders were delayed as a result of inappropriate ordering, the jury had an adequate evidentiary basis on which to accord more weight to this across-the-board phenomenon.

In choosing not to address each and every statistical comparison produced by appellees in the case *sub judice*, we are compelled to observe that for every factual contention presented, there is an equally viable countervailing evidentiary posture submitted. In any event, the jury had before it evidence of troubled relations between Nester and GM, of possible harassment by GM officials, and of a sudden and substantially unexplainable disparity between the order response times subsequent to Classic's entry into the market.

At trial, GM neither denied nor provided a clear explanation of these across-the-board disparities, let alone offer any affirmative matter to the contrary. Based upon the evidence presented to it, it was within the jury's province to conclude that GM violated R.C. 4517.59(A) and (F). Accordingly, we find no error in the trial court's refusal to grant GM a directed verdict or judgment n.o.v. with regard to these statutory claims, and GM's second and third assignments of error are without merit.

■ In its fourth assignment of error, GM alleges that:

"The trial court erred in overruling GM's motion for judgment notwithstanding the verdict with respect to plaintiffs' alleged damages."

The crux of appellant GM's argument is that appellees failed to prove that the alleged damages were proximately caused by the alleged statutory violations. We disagree.

Under the law of Ohio, the plaintiffs must show that their damages are proximately caused by the specific statutory provisions. See *Neff Lumber Co. v. First Natl. Bank of St. Clairsville* (1930), 122 Ohio St. 302, 305, 171 N.E. 327, 329. Appellees' evidence was presented in large part through the testimony of an expert, Dr. Lyman Ostland.

Ostland testified that the primary catalyst for the eventual collapse of Evans was "the allocation system and how that allocation system was manipulated for the aid and assistance of Classic Chevrolet." Ostland used economic damage models constructed from a myriad of sources. He relied heavily on Evans's dealer financial statements, information about the nature of Evans's facilities, GM's answers to interrogatories regarding allocation and distribution, GM financial reviews of the greater Cleveland area, GM forecasts for Evans's future sales, as well as other internally generated material.

In his calculation, Ostland took into consideration the number of vehicle sales lost as a result of the alleged misallocation, population and market growth forecasts, Evans's history of profitability and stability, and estimates of Nester's longevity. His two damage estimate models indicated lost profits resulting from the discriminatory allocation ranging from a low of approximately $5.4 million to an upper limit of $6.8 million.

Upon review of the record before this court, it is apparent that appellees produced evidence sufficient to create a jury question as to the issue of damages. *Pariseau, supra.* As the trier of fact, the jury was properly instructed to accept or reject the expert testimony, and as sole weigher of the credibility of the witness, could accept all, part or none of the testimony. *Ace Steel Baling v. Porterfield* (1969), 19 Ohio St.2d 137, 48 O.O.2d 169, 249 N.E.2d 892; *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 40 O.O.2d 87, 228 N.E.2d 304. Accordingly, we conclude that the trial court did not err in refusing to grant GM's motion for directed verdict and judgment n.o.v. with regard to the issue of damages.

■ In the fifth assignment of error, GM maintains that:

"The trial court erred by not excluding the undisclosed testimony of plaintiff's expert witness and by refusing to admit the proffered rebuttal testimony of GM's expert witness."

The record reveals that on April 8, 1988, GM submitted interrogatories to appellees requesting, *inter alia*, information regarding damages, their calculation, the identities of expert witnesses, their opinions and the bases for such

opinions. Appellees responded by providing the names of three expert witnesses, and stated that appellees had no knowledge of their opinions. GM filed a motion to compel. On July 8, 1988, the court ordered appellees to "answer all interrogatories validly, unambiguously, and directly under the rule."

The original papers before this court reflect that appellees served their supplemental answers to GM, and filed notice of service pursuant to Civ.R. 5(B). However, appellees did not file these supplemental answers with the trial court pursuant to Civ.R. 5(D). While this court is fully cognizant of the fact that Civ.R. 5 does not mandate the filing of interrogatories, our determination of issues on appeal is constrained to those items which are part of the *record* before us. Accordingly, we may not consider answers to interrogatories which were never filed with the clerk of the trial court. App.R. 9(A).

This court may, however, consider those portions of appellees' supplemental answers read into the record by GM's counsel at trial without objection. With respect to the alleged damage calculations, GM's counsel characterized appellees' supplemental answer as stating that the "damage calculation will include an extrapolation of Evans' income and profits based on past performance, economic changes, damage will be based on performance of similar dealers in the MDA, Classic Chevrolet's damages, other typical dealers in the Cleveland MDA, using all dealers to establish an average."

In addition to the supplemental answers to interrogatories, the trial court ordered that any expert reports be *completed* and *exchanged* by September 1, 1988. However, the record before this court is devoid of any indication that these reports were either completed or exchanged by the parties.

On January 9, 1989, GM filed a motion *in limine* which sought, *inter alia,* the preclusion of any expert testimony in support of plaintiffs' claims. Although refusing to completely exclude expert testimony, the trial court ruled that:

"Plaintiff will be denied the opportunity to supplement or provide information upon all subjects which should have been answered to interrogatories but were answered incompletely or evasively."

Despite the existence of the motion *in limine,* appellees produced Ostland's extensive report several days prior to trial. The transcript reveals that counsel for GM refused to accept the report so close to trial. On September 11, 1989, during trial, GM requested that the court preclude Ostland's testimony. Nevertheless, the trial court ruled that it would accept the testimony, stating:

"I guess I'm going to be patently unfair. We are going to go. I've had it. * * * I don't know that it's right, but I have had it."

On September 13, 1989, GM moved for a mistrial, and also requested a continuance to depose Ostland. The court denied the mistrial, but allowed GM three hours to conduct a deposition that morning. That afternoon, Ostland proceeded to testify. Two days later, GM requested that it be permitted to offer expert testimony to rebut Ostland's damage models. The request was denied. Finally, GM filed a post-trial motion for new trial based, in part, on the appellees' failure to disclose the nature or extent of Ostland's testimony. Once again, GM was denied relief.

The Supreme Court of Ohio, in *Jones v. Murphy* (1984), 12 Ohio St.3d 84, 12 OBR 73, 465 N.E.2d 444, noted that the purpose of the Rules of Civil Procedure is to prevent surprise to either party at the trial or to avoid hampering either party in preparing its claim or defense for trial. This element of surprise is eliminated through "a discovery procedure which *mandates a free flow of accessible information* between the parties upon request, and which imposes sanctions for failure to timely respond to reasonable inquiries." *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 370, 28 OBR 429, 431, 504 N.E.2d 44, 47.

In *Shumaker*, the Supreme Court stated:

"Civ.R. 26(E)(1) provides that ' * * * [a] party is under a duty seasonably to supplement his response with respect to any question directly addressed to * * * (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify.' An objective of this rule is to provide opposing counsel with updated and complete discovery regarding the substance of expert testimony. This duty to supplement responses on the subject matter of expert testimony is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." *Id.* at 370, 28 OBR at 431, 504 N.E.2d at 47.

Civ.R. 37 permits the exclusion of expert testimony pursuant to a motion *in limine* as a sanction for a violation of Civ.R. 26. *Jones, supra.* While a trial court possesses substantial discretion in issuing remedial sanctions, see *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 85–86, 19 OBR 123, 124–125, 482 N.E.2d 1248, 1250–1251, this discretion is not unbridled. *Shumaker, supra.* Where the undisclosed testimony of an expert witness creates substantial likelihood of surprise and there is an indication that one party deliberately disrupts the free flow of information between the parties, the trial court *must either* exclude such testimony or allow the other side time to find and present rebuttal testimony.

■ In the instant case, appellees maintain that GM knew the identity of their expert economic witness, knew that his testimony would go to alleged damages, and yet chose not to depose him. Accordingly, appellees' claim that GM cannot claim surprise. This line of argumentation is erroneous for several reasons. First, Ostland did not *complete* his extensive damage calculations until well after the court imposed cutoff for discovery. Second, appellees clearly violated the court order requiring exchange of expert reports by September 1, 1989. Finally, the court's prior granting of the motion *in limine* created the appearance that the trial judge would not permit Ostland's testimony. Any suggestion that GM could effectively depose Ostland *before* he had familiarized himself with the underlying facts of the case *sub judice* is specious.

Accordingly, the refusal of the trial court to do either alternative was prejudicial. GM was clearly surprised and prejudiced by the failure to timely reveal the full nature, direction, substance and scope of Ostland's testimony. Under these circumstances, fundamental fairness required that GM should have been afforded an opportunity to present a rebuttal witness to the jury on the elements presented by appellees' expert. Therefore, this assignment is well taken.

■ In the sixth assignment of error, GM alleges that:

"The trial court failed to exercise executive control over plaintiffs' counsel throughout the trial."

In support of its assignment, GM offers two lines of attack.

First, GM focuses on the fact that the court had previously granted summary judgment in favor of GM as to GM's liability in *establishing* Classic, and further granted a motion *in limine* precluding appellees from presenting evidence or argument on this issue. GM alleges that the trial court failed to curtail appellees' counsel as he embarked upon a course of questioning which *focused on the establishment* of Classic in an effort to inflame and mislead the jury into considering an issue which was irrelevant to the case.

The transcript establishes that appellees' counsel often referred to Classic's entrance into the market. However, after a thorough reading of the transcript, it becomes readily apparent that counsel's line of questioning was not intended to suggest that GM was liable for "opening" Classic. Rather, Classic's entrance into the market was used as a temporal reference marking the point at which the alleged bad faith and discriminatory conduct began. Since it was alleged that GM's bad faith and discriminatory conduct was evidenced by Classic's abnormally large "open inventory," we conclude that references to Classic's "opening" were inescapable in this context.

■■■ Second, GM argues that the trial court, after objection, failed to exercise control over the improper closing argument of opposing counsel. Specifically, GM maintains that opposing counsel's closing argument was intended to create a false impression which would incite the passion of the jury.

Throughout the course of the trial, appellees struggled to establish that an animus existed between Nester and GM's zone manager, Mr. Sheehan, and that Sheehan's actions were a source of coercion and intimidation. In closing argument, appellees' counsel stated:

"Where is Mr. Sheehan? Where is this man who ran the Zone? Where is this man who could answer lots of questions? Why isn't he here?

"I took his deposition. I'll tell you why he is not here, because General Motors doesn't want him here."

In response to GM's assertion, we note that a trial court is vested with discretion to determine whether alleged misconduct of counsel is sufficient to taint the verdict with passion or prejudice. *Jackson v. Booth Mem. Hosp.* (1988), 47 Ohio App.3d 176, 547 N.E.2d 1203. Moreover, before this court will disturb the exercise of the trial court's discretion, the record must clearly demonstrate that counsel's conduct and inappropriate argument "creat[ed] an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice can not be accomplished." *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 351, 8 O.O. 108, 113, 7 N.E.2d 544, 549; *Jackson, supra.*

We do not think that this small excerpt to which appellant objects, standing alone, demonstrates the taint of passion or prejudice to an unsuitable level, although it is clear that the statement was inaccurate and misleading since the deposition to which reference is made was undertaken by appellees' counsel in another unrelated case involving GM.

Based upon the foregoing analysis, we find appellant's sixth assignment of error to be without merit.

■■■ In the seventh assignment of error, GM asserts that:

"The trial court erred to the prejudice of GM in granting plaintiffs' motion for increased damages pursuant to Ohio Rev.Code Section 4517.65(A)."

The crux of GM's argument is that the conduct alleged to have been committed in violation of the statute took place prior to the effective date of the "double damage" provision in R.C. 4517.65(A), effective March 14, 1980. Consequently, GM asserts that the statutory imposition of double damages is inapplicable to the case *sub judice.* This assignment is partially well taken.

"When a franchisor does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the franchisee in double the amount of actual damages sustained, plus court costs and reasonable attorney fees." R.C. 4517.65(A).

As we noted in the first assignment, "a statute is presumed to be prospective in its operation unless *expressly* made retrospective." (Emphasis added.) R.C. 1.48; see, also, *Van Fossen, supra,* 36 Ohio St.3d at 106, 522 N.E.2d at 495. R.C. 4517.65(A) offers no indication that it is to be applied retroactively. Moreover, such a double damages provision affects a substantial right by imposing additional liability and may not be retroactively applied under Section 28, Article II, Ohio Constitution. See *OSAI v. A & D Furniture Co.* (1981), 68 Ohio St.2d 99, 100, 22 O.O.3d 328, 329, 428 N.E.2d 857, 858; see, also, *Van Fossen, supra.* Accordingly, we must presume its prospective operation.

Appellees' amended complaint generally alleged violations of R.C. 4517.59 "from August 1, 1979 and thereafter." Along these lines, appellees offered testimony and exhibits evidencing maldistribution of vehicles, disparate response times, failure to fill orders, and preferential treatment of Classic during a period beginning with the opening of Classic in 1979 and continuing until Evans's ultimate demise in 1981.

While appellees' damage assessments focus upon "lost sales" throughout the 1979 to 1981 period and beyond, appellees attempt to argue on appeal in terms of GM's "entire course of conduct"—suggesting that their damages cannot be apportioned between pre-enactment and post-enactment misconduct. We cannot agree with this line of argumentation. Lost sales suffered in 1979 because of GM's misconduct are damages suffered *at that time,* and cannot be characterized as a damages suffered at a later date.

Because of the prospective operation of R.C. 4517.65(A), it may be applied to double only those damages that are attributable to post-enactment misconduct. We, therefore, hold that "lost sales" prior to March 14, 1980 are pre-enactment damages not subject to statutory doubling under R.C. 4517.65(A).

Accordingly, GM's seventh assignment of error is with merit.

 In their first cross-assignment of error, appellees, in their role as cross-appellants, assert that:

"The trial court erred by failing to grant the plaintiffs' motion for attorney fees in violation of ORC 4517.65(A)."

Under R.C. 4517.65(A), effective March 14, 1980:

"When a franchiser does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the franchisee in double the amount of actual damages sustained, *plus court costs and reasonable attorney fees.*"

We have determined that the violative course of conduct ran until the ultimate demise of Evans in December 1981. Accordingly, there can be no claim of retroactive application with respect to the claimed attorney fees.

Here, appellees entered into a forty percent contingency fee contract with their counsel. Based upon the double damages awarded, the fees generated by this agreement would translate into the sum of $4,219,840. However, at the hearing on post-trial motions, counsel claimed the sum of $240,123 as attorney fees. Counsel supported the claimed amounts by presenting the trial judge with affidavits setting forth an itemized billing. Although never formally admitted into evidence, it is apparent from the trial court's ruling on the motion that the judge accepted the supporting documents as evidence and considered them in making his determination.

Counsel for GM did not attack the reasonableness of the claimed attorney fees by opposing affidavit or any other evidential matters.

Nevertheless, the trial court held that the claims of counsel alone are insufficient evidence upon which "reasonable" attorney fees could be awarded. The court further noted in its opinion that, in cases such as these, attorney fees could not be awarded absent corroborative, expert testimony as to reasonable rates. We disagree.

In *In re Weller* (Jan. 16, 1987), Lake App. No. 11–158, unreported, this court stated that when an attorney's recapitulation of his fees is accepted as evidence and is uncontradicted by opposing counsel, it is, *standing alone,* sufficient to maintain the motion for fees. *Id.* at 2–3. Accordingly, there was adequate evidence presented to go forward with a determination of attorney fees.

We therefore conclude that the determination of the amount of reasonable attorney fees should be remanded to the trial court for further proceedings. Upon remand, the trial court is directed to calculate the amount by some ascertainable standard by considering the factors set forth in *State ex rel. Montrie Nursing Home, Inc. v. Creasy* (1983), 5 Ohio St.3d 124, 5 OBR 258, 449 N.E.2d 763. These factors include: " * * * (1) the time and labor involved in maintaining this litigation, (2) the novelty, complexity, and difficulty of the questions involved, (3) the professional skill required to perform the necessary legal services, (4) the experience, reputation, and ability of the attorneys, and (5) the miscellaneous expenses of this litigation." *Id.* at 128, 5 OBR at 262, 449 N.E.2d at 767. Furthermore, although many of the opinions on the

subject of requested attorney fees either omit any reference to the element of necessity while speaking of reasonable fees, or at best treat this factor inferentially, this writer fails to comprehend the rationale for this omission. Clearly, for example, it is generally held to be an element of analogous medical fees in damages exercises. See *DeTunno v. Shull* (1957), 166 Ohio St. 365, 2 O.O.2d 281, 143 N.E.2d 301. Logically, a "one-legged" submission of a prevailing "reasonable attorney's hourly rate" in a given geography, times the number of hours claimed to have been incurred, may well beg the question. Central to such submission is the question as to whether such hourly totals were appropriate when measured against basic professional attorney standards. Unequivocally, three of the *Creasy* factors relate to the professional necessity of the total time claimed. It appears long overdue to address the issue of attorney fee requests with this degree of precision. The test, indeed, should be to allow such emoluments when the requested fees are both reasonable and necessary.

Appellees' first cross-assignment of error has merit.

■■ In the second cross-assignment of error, appellees alleged that:

"The trial court erred by overruling the plaintiffs' motion for costs in its entirety in violation of Civ.Rule 54(D) and O.R.C. 4517.65(A)."

In ruling on the motion to tax costs, the trial court stated that counsel for appellees failed to provide an adequate explanation of the total costs, and thus awarded only $3,392.16. Appellees now contend that they are entitled to an additional $111,007.34, principally for claimed litigation expenses.

From the outset, it should be noted that when filing the motion to tax costs, counsel for appellees attached an itemized compilation of costs totalling $68,666.68. However, during the post-trial hearing, counsel apparently submitted a revised compilation totalling over $111,000. This "new and improved" version never made it into the record on appeal. Accordingly, we are constrained to a review of the original itemization.

Civ.R. 54(D), which deals with costs, states that:

"Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."

A determination of allowable taxable costs requires a two-step analysis by the trial court. First, the court must ask whether the item is a taxable litigation expense or a personal expense. Second, the court must determine whether the expense should be taxed in the particular case. *Jones v. Pierson* (1981), 2 Ohio App.3d 447, 2 OBR 542, 442 N.E.2d 791, paragraph one of the syllabus.

██ Personal expenses, which are not recoverable, are defined as those expenses incurred by a party in preparing the case for trial. *Id.* at 449, 2 OBR at 544, 442 N.E.2d at 794. Taxable litigation expenses are necessary and vital to the litigation. *Id.*

A review of the fourteen items disallowed as costs by the trial court reveals that a substantial majority of the claimed costs were either directly or indirectly related to appellees' acquisition of expert testimony.[1] Recently, this court specifically disallowed expenditures for the acquisition of expert testimony pursuant to Civ.R. 54(D) in *Rosenbaum v. Voorhees* (May 18, 1990), Geauga App. No. 89–G–1522, unreported, 1990 WL 67763 (quoting *Gold v. Orr Felt Co.* [1985], 21 Ohio App.3d 214, 216, 21 OBR 228, 230, 487 N.E.2d 347, 349). But, see, *Adkins v. Wright* (Sept. 30, 1987), Ashtabula App. No. 1285, unreported (allowing as taxable costs the expense of preparing a videotape deposition of an expert witness used at trial). Accordingly, we find no error in the trial court's disallowance of any claimed expert fees.

██ The remaining disallowed items, which consist primarily of expense for court reporters for depositions, travel expenses, postage, freight, phone bills, and computer-aided research, are all claimed to be *necessary and vital* to the litigation.[2] Appellees now argue that these expenditures somehow fall under the general umbrella of "deposition cost" and therefore must be awarded.

While this court has held that deposition expenses may be awarded as taxable costs, it is equally true that the party seeking such an award must show that the depositions were *necessary and vital* to the litigation. Often, the question turns on the *use* to which the deposition was put. See, *e.g., Jones, supra,* 2 Ohio App.3d at 451, 2 OBR at 546, 442 N.E.2d at 795; *Hanlin v. East Mfg. Corp.* (Dec. 7, 1990), Portage App. No. 90–P–2180, unreported, at 10–13, 1990 WL 199107. However, in the present case, appellees offer no evidence indicating the necessity of the "critical" depositions.

When a trial court exercises its discretion in determining whether to tax costs under Civ.R. 54(D), a reviewing court will not overturn such a decision unless there has been an abuse of that discretion. *Hanlin, supra,* at 11. After a thorough review of the record, it is apparent that appellees did, indeed, fail to adequately explain their litigation expenses.

Accordingly, the second cross-assignment of error is without merit.

---

1. Appellees' attached itemization reveals an amount of $51,358.15 in expert fees, of which $40,930.96 was paid to Dr. Lyman Ostland.

2. Appellees claim a total amount of $17,308.53 as "litigation expenses."

█ In their final cross-assignment of error, appellees maintain that:

"The trial court erred by denying plaintiffs' motion for prejudgment interest, since the defendant repeatedly violated the requirements of O.R.C. 1343.03(C)."

R.C. 1343.03(C) allows prejudgment interest to be awarded where the liable party "failed to make a good faith effort to settle the case." In the instant action, the trial court held that "neither attorney acted in good faith in discovery or negotiation," and therefore it would be improper to award prejudgment interest.

As in *Hardiman v. Zep Mfg. Co.* (1984), 14 Ohio App.3d 222, 228, 14 OBR 250, 256, 470 N.E.2d 941, 948, this court "do[es] not believe this is the proper case to delineate what 'failed to make a good faith effort to settle' entails or requires." This is so because the record demonstrates that each party made minimal efforts to settle this case, and their lethargy was roughly equivalent.

Despite uncorroborated claims of "numerous oral offers" to settle the case, the record reveals that appellees made only one written settlement offer for $3,000,000. Without the aid of appellees' extensive expert assessment of alleged damages, which was produced only several days before trial, GM responded with a single written counter-proposal of $25,000. No other steps toward settlement took place.

In *Hardiman, supra,* the court noted:

"The minimal efforts to settle made by both sides are essentially equivalent. Therefore if appellant's conduct is considered a failure to make a good faith effort to settle, we believe appellee also failed to make a good faith effort to settle. Conversely, if appellee's actions are sufficient so that he did not fail to make a good faith effort to settle the case, then appellant, having acted in an essentially equivalent manner, also did not fail to make a good faith effort to settle. Whichever approach is taken, based on the facts of this case and according to the requirements of R.C. 1343.03(C), it was improper to award prejudgment interest to appellee." *Id.,* 14 Ohio App.3d at 228, 14 OBR at 256, 470 N.E.2d at 948.

Having determined that an award of prejudgment interest would be improper in the case *sub judice,* we find no error in the trial court's refusal to grant appellees' motion. Accordingly, appellees' third cross-assignment of error is without merit.

Therefore, the judgment of the trial court is affirmed as to appellant GM's first, second, third, fourth, and sixth assignments, and reversed as to its fifth and seventh assignments. With respect to appellees/cross-appellants' cross-assignments of error, we affirm the trial court's judgment as to the second

and third cross-assignments of error, and we reverse the trial court's judgment with respect to the first cross-assignment. The case is remanded to the trial court for further proceedings consistent with this opinion as to the appellant GM's fifth and seventh assignments of error, and the appellees' first cross-assignment of error.

*Judgment accordingly.*

CHRISTLEY, P.J., and JOSEPH E. MAHONEY, J., concur.