Appellants Christine and Michael Vuyancih ("Vuyancih") appeal a decision by the trial court denying their motion for a new trial in a chiropractic malpractice action against Appellees Bond Chiropractic Center and Bruce Bond ("Bond"). Vuyancih assigns the following error for our review:
 I. WHETHER THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL, IN FAVOR OF BOND CHIROPRACTIC CENTER, ET AL., DEFENDANTS.
Having reviewed the record and the legal arguments of the parties, we affirm the decision of the trial court. The apposite facts follow.
Christine Vuyancih was employed as an architectural illustrator of Retail Planning Associates in Columbus, Ohio. While living in Columbus, Vuyancih experienced migraine headaches. She visited a neurologist who prescribed muscle relaxers for treatment of the headaches. However, the muscle relaxers rendered Vuyancih unable to perform her job. She then consulted a specialist who diagnosed her with temporomandibular joint disorder (TMJ) and prescribed a mouth appliance to prevent nighttime teeth grinding. When she failed to achieve relief from the headaches, Vuyancih began seeing a chiropractor, Dr. Christopher Keller. Keller treated Vuyancih's headaches by manipulating her neck. The treatments gave Vuyancih relief from the headaches.
In 1993, Vuyancih moved to Cleveland, Ohio to work as a commercial artist at Accent Design, an architectural design firm. After her relocation to Cleveland, Vuyancih began seeing local chiropractor Bruce Bond. Her first visit with Dr. Bond took place on February 10, 1994. On that visit, Bond completed a form listing Vuyancih's family medical history and personal medical history. The form listed Vuyancih's chief symptoms as sporadic migraines and nausea. Bond treated her by performing a rotary adjustment of her neck. Bond also saw Vuyancih on February 17, 1994 where she appeared with symptoms of slight headache and neck ache. On that date, he wrote in a progress report that Vuyancih "has had chiropractic care for migraines in the past and has had very good results." Bond performed a bilateral cervical spine manipulation on Vuyancih on February 17, 1994. Bond saw Vuyancih again on July 28, 1994. On that date, she complained of a stiff neck and said that she felt something pop after moving. Bond again performed a neck manipulation. Vuyancih later testified that she did get some relief from her symptoms after Bond's treatments.
On December 28, 1994, Vuyancih went to the Urgent Care Center seeking treatment for a sore neck and flu-like symptoms including congestion and vomiting. The Urgent Care Center prescribed amoxicillin and Vuyancih returned home. On New Year's Eve 1994, Vuyancih became ill and went to bed early. She was again experiencing flu-like symptoms, including a slight headache which got progressively worse during the afternoon. She went to the Urgent Care Center again on New Year's Day because her symptoms had not improved. Her vomiting was more frequent and her neck was sore. During her visit, x-rays were taken of her neck and she was given a cervical collar.
On January 2nd, Vuyancih called Dr. Bond's office for an appointment because she was still not feeling better. She went to Bond's office later that day. According to Vuyancih, Bond treated her by turning her neck "twice to the right and twice to the left very forcefully." Before manipulating Vuyancih's neck, Bond did not check her vital signs or speak with her in detail about her condition. After the manipulation, Vuyancih received therapy which consisted of cold packs and ultrasound stimulation of her neck.
After her visit to Bond on January 2nd, Vuyancih began to feel better and went to dinner with her husband. Later that evening, her headaches began to subside and her neck began to hurt. On the following morning, January 3rd, Vuyancih began to feel nauseous while getting dressed for work.
After arriving at work, Vuyancih went into the kitchen to get some coffee. While there, she told a co-worker, Lisa Telzrow, that she had not been feeling well and had been throwing up forcefully that morning. After returning to her desk, Vuyancih noticed that the room was spinning, her vision became blurry, and she became unable to concentrate on her work. Telzrow came over to see what was wrong. Telzrow spoke to Vuyancih but Vuyancih replied that she could not hear what Telzrow was saying.
Telzrow told Vuyancih to place her head down on her desk. Vuyancih's boss, Gary Seachrist, urged Vuyancih to lie down on the couch in his office. After resting for 20 or 30 minutes, Vuyancih called her parents to ascertain if they could drive her to the doctor's office. After learning that her father was available to drive her to the doctor, Vuyancih was driven home by Telzrow. On the way home, Vuyancih complained of severe neck pain.
After she arrived home, Vuyancih called Dr. Bond's office. She told Dr. Bond about what happened at work and Bond replied that she should come to see him first before she went to the hospital. Vuyancih's father arrived and drove her to Bond's office. Once there, Vuyancih described her condition on a form as "terrible neck pain, nausea, vomiting" and marked the neck area as the source of her pain.
Bond instructed her to have therapy first which consisted of ultrasound, cold packs and pulsating treatments. When she returned to his office, Bond turned her neck twice to the right and twice to the left. Thereafter, Vuyancih went home and went to bed. She woke up around three o'clock in the afternoon and was still experiencing excruciating neck pain. She decided to go to the emergency room and called her parents to ask if they would drive her there.
Vuyancih began vomiting uncontrollably and her left side became numb. When her parents arrived, they called 911. As she waited for the ambulance, Vuyancih's right side began to go numb. Paramedics rushed Vuyancih to the Euclid General Hospital. A CAT scan was performed. During the scan, Vuyancih suffered respiratory arrest. She was then life-flighted to University Hospital where a repeat CAT scan was performed along with a MRI scan and a MRA scan.
Neurologist Edward Westbrook treated Vuyancih at University Hospital. At trial, he testified that Vuyancih suffered a vertebral artery dissection.[1] The dissection caused substantial swelling of the brain which was relieved by emergency surgery. After a lengthy period of recuperation, Vuyancih was left with trouble speaking and swallowing, impaired hand-eye coordination, trouble walking, and short-term memory loss. Westbrook testified that her injuries were permanent.
He also stated that Dr. Bond departed from the basic minimum standard of care applicable to physicians by failing to properly evaluate Vuyancih's symptoms. He opined that Vuyancih's symptoms as of the time she visited Dr. Bond on January 3rd suggested an oncoming neurological catastrophe. He also added that Bond's manipulation of Vuyancih's neck on January 3rd precipitated further damage to Vuyancih's cerebellum and brain stem.
On cross examination, Westbrook conceded that neck pain was common in vertebral artery dissections and that Vuyancih may have suffered the dissection before she visited Dr. Bond on January 2nd. He admitted that, although vertebral dissections often lead to strokes such as that suffered by Vuyancih, there can often be a delay of up to several weeks between the dissection and a resulting stroke. He also admitted that the pain experienced by patients suffering from vertebral artery dissection can be very similar to a very severe headache and can be confused with migraine pain.
Vuyancih also presented the testimony of chiropractor Charles Duvall who opined that Bond's failure to conduct a history, failure to perform a complete examination, failure to obtain the x-rays from Vuyancih's visit to Urgent Care, and his failure to fully inform Vuyancih of the inherent risks of manual manipulation constituted malpractice.
Dr. Bond testified that he conducted an examination of Vuyancih on January 3rd although his records contain no notation that such an exam was performed. He explained that the examination was not recorded because Vuyancih was not charged for it. He stated that Vuyancih's symptoms were indicative of a migraine headache — a condition for which he had treated her on previous occasions. He maintained that the manipulation he performed on Vuyancih's neck was no different from those he always performed. He denied extending or rotating her neck.
Dr. Robert Harbaugh, a neurosurgeon, testified on Bond's behalf. Harbaugh opined that Vuyancih suffered a spontaneous vertebral artery dissection. He added that women and people with a history of migraine headaches were at higher risk for spontaneous vertebral artery dissection. He stated that even if Vuyancih had been immediately referred to a medical care facility, the outcome would not have been any different.
The jury rendered a general verdict in favor of Bond and Bond Chiropractic Center. The jury responded "no" to each of the following interrogatories:
 Do you find that the Plaintiffs have proved by a preponderance of the evidence that the Defendant deviated from the accepted standard of care of a chiropractic physician in the treatment rendered to Plaintiff Christine Vuyancih?
 Do you find that the Plaintiffs have proved by a preponderance of the evidence that a deviation from the accepted standard of care of a chiropractic physician by Defendant proximately caused injury to the Plaintiff Christine Vuyancih?
 Do you find that the Plaintiff Michael Vuyancih has proved by preponderance of the evidence that a deviation from the standard of care of a chiropractic physician by Defendant which proximately caused injury to Plaintiff Christine Vuyancih, was a proximate cause of a loss of consortium?
Vuyancih filed a timely motion for new trial under Civ.R. 59(A)(6) and (7), alleging that the jury's verdict was against the manifest weight of the evidence. The trial court denied the motion without explanation. This appeal followed.
Civ.R. 59(A)(6) (7) provide that a new trial may be granted on the grounds that the verdict is not sustained by the weight of the evidence or that the judgment is contrary to law. When reviewing the trial court's decision on a motion for new trial, we are guided by the principle that the denial of a motion for new trial should only be reversed when the denial of the motion constitutes an abuse of discretion. Fields v. Mansfield Asphalt Paving Co. (Nov. 7, 1995), Richland App. No. 94-CA-94, unreported, citing Yungwirth v. McAvoy (1972), 32 Ohio St.2d 285,286; Sczepaniak v. Steadman (Aug. 23, 1995), Summit App. No. 17069, unreported; Pena v. Northeast Ohio Emergency Affiliates,Inc. (1995), 108 Ohio App.3d 96, 103, appeal dismissed (1996),75 Ohio St.3d 1494; Tobler v. Hannon (1995), 105 Ohio App.3d 128,130, appeal dismissed (1995), 74 Ohio St.3d 1463. A jury's verdict should not be overturned as against the manifest weight of the evidence if there is competent, credible evidence to support the jury's finding. Freeman v. Holzer Medical Center
(Dec. 20, 1995), Gallia App. No. 94CA20, unreported; AirborneExpress, Inc. v. Sys. Research Laboratories, Inc. (1995),106 Ohio App.3d 498, 507, discretionary appeal not allowed (1996),75 Ohio St.3d 1411.
In order to prevail on her malpractice complaint, Vuyancih had to show that Bond owed her a duty of care, and that Bond's breach of that duty proximately caused her injuries.
 The law imposes upon physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the same medical specialty would employ in like circumstances. A negligent failure to discharge that duty constitutes "medical malpractice" if it proximately results in an injury to the patient. Whether negligence exists is determined by the relevant standard of conduct for the physician and is proved through expert testimony.
Cox v. Ohio State University Hospitals (1996), 117 Ohio App.3d 254,259 (citations omitted), appeal dismissed (1997), 80 Ohio St.3d 1220. See also Allore v. Flower Hosp. (1997), 121 Ohio App.3d 229,235, discretionary review denied (1997), 80 Ohio St.3d 1437.
In her brief before this court, Vuyancih argues that the testimony of Drs. Westbrook and DuVall established that Bond deviated from the chiropractic standard of care when treating her on January 3rd by failing to take a full, adequate, and complete patient history before manipulating her neck, failing to take note of her symptoms, failing to perform a neurological exam, and failing to immediately refer her to a medical care facility.
The transcript reveals Dr. Bond admitted he did not take a full history or perform a neurological exam on Vuyancih on January 3rd. However, Dr. Bond presented the testimony of neurologist Dr. Robert Harbaugh who opined that a detailed patient history, while admittedly important, was usually taken from first time patients, not on subsequent visits.
Dr. Harbaugh testified that Vuyancih's injuries were caused by a spontaneous vertebral artery dissection, not by Dr. Bond's treatment. He also stated that Bond's failure to immediately refer Vuyancih to a medical care facility did not contribute to her injuries.
Dr. Duvall testified that a patient exhibiting symptoms of severe neck pain, severe head pain, nausea, vomiting, dizziness, difficulty walking and standing straight, difficulty seeing, and difficulty hearing indicates either an aneurysm or a possible dissection of the vertebral arteries. Also, Dr. Harbaugh admitted that a physician who encounters a patient suffering from tremendous headache, tremendous neck pain, forceful vomiting, hearing loss, blurred vision, dizziness, and nausea should immediately refer the patient to a medical care facility. However, a review of Vuyancih's fee slip for January 3rd reveals that she listed her symptoms as terrible neck pain, nausea, and vomiting, making no mention of forceful vomiting or dizziness. Bond testified that Vuyancih did not tell him she had been vomiting forcefully or that she had been to Urgent Care twice before coming to see him. Furthermore, Vuyancih admitted that she did not include forceful vomiting, loss of equilibrium or dizziness when she listed her symptoms on the fee slip form completed on her January 3rd visit to Dr. Bond's office.
Harbaugh stated that almost no one can diagnose vertebral artery dissection until it manifests itself through neurological symptoms. In Vuyancih's case, Harbaugh testified that Vuyancih did not exhibit neurological symptoms until after she arrived at the emergency room on January 3rd.
 The classic presentation of vertebral artery dissection — and this is what always happens is someone shows up with neck pain and headache almost 100 percent of the time. Sometime after that, five hours, five days, three weeks, they develop neurological problems and at that point are diagnosed as a vertebral artery dissection.
 And if you look through the cases and the literature, that is a very, very, very common scenario. I think in this case, there is evidence of headache, neck pain, soreness on the 28th that's bad enough to get someone to the emergency room; that that persists, actually gets worse over the next few days, and again goes into the emergency room with headache, neck pain, all the things that you would expect from a vertebral artery dissection. Again is seen in the emergency room and sent out; subsequently sees Dr. Bond on two occasions, again the same symptoms, and then goes on to develop an unequivocally (sic) stroke from vertebral artery dissection.
 And it would be astounding to say that the headache and neck pain and such that was going on on the 28th, January 1st and on January 2nd were something completely unrelated and then suddenly on January 3rd she developed a dissection. I mean, I just don't think that makes any sense. It would be just a coincidence that's hard to believe. So I think her dissection occurred on the 28th, on or about the 28th.
(Tr. 784-785.)
This testimony constitutes competent, credible evidence which supports the jury's finding that Dr. Bond did not deviate from the applicable standard of care. The evidence indicates that the combination of symptoms which would have alerted a reasonable physician of the need for immediate medical care were either not present or not disclosed to Dr. Bond at the time he treated Vuyancih on January 3rd. Consequently, Vuyancih did not establish that Bond deviated from a reasonable standard of care applicable to chiropractic physicians.
On the issue of causation, the parties presented conflicting testimony as to the cause of Vuyancih's vertebral artery. Dr. Duvall testified that it was caused by the manipulation performed by Dr. Bond on January 3rd. Dr. Westbrook testified that Vuyancih suffered from bilateral disease of the vertebral arteries and that Bond's manipulation precipitated further damage to Vuyancih's cerebellum and brain stem. On the other hand, Dr. Harbaugh testified that Vuyancih suffered a spontaneous vertebral artery dissection on or about December 28th and that, even if Dr. Bond had immediately referred her to a medical facility when she saw him on January 3rd, such a referral would not have made any difference to the outcome of her condition.
It is well settled that determining the credibility of witnesses, including expert witnesses, is a function for the jury. Pangle v. Joyce (1996), 76 Ohio St.3d 389, 395; Paul v.Moore (1995), 102 Ohio App.3d 748, 756; Bailey v. Emilio C. Chu,M.D., Inc. (1992), 80 Ohio App.3d 627, 635, jurisdictional motions overruled (1992), 64 Ohio St.3d 1409; Turner v.Children's Hosp., Inc. (1991), 76 Ohio App.3d 541, 556, jurisdictional motions overruled (1992), 63 Ohio St.3d 1469; EarlEvans Chevrolet, Inc. v. Gen. Motors Corp. (1991), 74 Ohio App.3d 266,280. The jury's verdict makes clear that they chose to believe the testimony of Dr. Harbaugh.
 [I]n the last analysis, the jury * * * is the sole weigher of credibility and testimony. The jury can accept all, a part or none of the testimony offered by a witness whether it is expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact. In other words, `(t)he jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest.' * * * Thus the function of the expert who gives opinion testimony in order to aid the jury in reaching a just determination is entirely separate from the function of the jury which must assess credibility and settle controverted issues of fact.
McKay Mach. Co. v. Rodman (1967), 11 Ohio St.2d 77, 82.
Because there existed competent, credible evidence to support the jury's verdict, the trial court properly denied Vuyancih's motion for a new trial. The judgment of the trial court is affirmed.
JUDGMENT: affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
TIMOTHY E. McMONAGLE, P.J., and JOHN T. PATTON, J. CONCUR.
 ___________________________________ PATRICIA ANN BLACK ON JUDGE
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).
[1] Dr. Robert Harbaugh testified that vertebral artery dissection occurs when a tear in the inside lining of an artery allows blood that normally flows through the artery to get into the wall of the artery and dissect into the layers of the arterial wall. The dissection can close off the artery or cause clots to form which may later dislodge and travel elsewhere in the bloodstream.