WATSON et al.

v.

GRANT MEDICAL CENTER et al.

2003-Ohio-2704.]

Court of Common Pleas of Ohio,
Franklin County, Civil Division.

No. 99CVA03–2546.

Decided March 3, 2003.

David I. Shroyer, for plaintiffs.

Warren M. Enders, for defendants Cahill and Ophthalmic Surgeons & Consultants.

Michael Romanello, for defendant Medical Protective Company.

JOHN A. CONNOR, Judge.

## I. INTRODUCTION

{¶ 1} This matter comes before the court upon motion by plaintiff, Karin M. Watson ("plaintiff"), for prejudgment interest, filed March 6, 2002. Defendants, Kenneth V. Cahill, M.D., and Ophthalmic Surgeons and Consultants of Ohio, Inc. (collectively "defendants"), submitted their memorandum contra on March 20, 2002.

{¶ 2} In conjunction with the submission of plaintiff's motion for prejudgment interest, the court held a formal hearing on the record, pursuant to the mandate of R.C. 1343.03(C). This hearing was segmented, taking place before the court on the following dates: August 23, 2002, October 11, 2002, and October 25, 2002. At the conclusion of the hearing, counsel presented oral argument in summation to the court, in lieu of filing supplemental or additional memoranda.

{¶ 3} Based on this court's instruction, counsel for plaintiff further provided the court with transcripts of the testimony of John Lancione and John Heary from the hearing on plaintiff's motion for prejudgment interest. Equally, counsel for defendants has provided the court with transcripts of the testimony of Tim Harrison, Warren Enders, Dr. Kenneth Cahill, and Gerald Draper, the later of which took place by videotape. See *Decision and Entry dated November 8, 2002.*

## II. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 4} The above-styled matter is an action for medical malpractice that was filed subsequent to the treatment of plaintiff by Dr. Kenneth Cahill of Ophthalmic Surgeons and Consultants of Ohio, Inc. Plaintiff alleged in her amended complaint that Dr. Cahill was negligent in his treatment of plaintiff and, as a result, she suffered serious injuries to her eyes and vision. Plaintiff included Ophthalmic Surgeons and Consultants of Ohio, Inc., based on a claim of respondeat superior.[1]

{¶ 5} Specifically, it was alleged that defendants fell below the standard of care when treating plaintiff for a condition know as pseudotumor cerebri, also know as "PTC." This is a condition caused by the body's increased production of cerebral spinal fluid, or "CSF." The body's increased production of CSF results in increased intracranial pressure, which in turn places undue pressure on the optic

---

1. It is worth noting that plaintiff also named as defendants four additional physicians who treated plaintiff in this action, but ultimately, those parties were dismissed by plaintiff with prejudice, based on an agreed-upon settlement.

nerves. As a result of the pressure placed on plaintiff's optic nerve, plaintiff suffered a nearly total loss of vision.[2]

{¶ 6} On February 4, 2002, a trial of this case took place in this court before a jury. After considering approximately eight days of testimony, the jury returned a verdict in plaintiff's favor for $8.6 million, reduced by 32 percent, the percentage of comparative fault the jury assigned to plaintiff. The net result of the jury's verdict is $5.85 million for plaintiff, which was journalized by entry filed on February 22, 2002.

{¶ 7} Recently, on February 26, 2003, this court overruled defendants' motion for judgment notwithstanding the verdict or for a new trial, or in the alternative, motion for remittitur, filed March 7, 2002.

{¶ 8} Presently, plaintiff moves this court to issue an order assessing the only remaining matter before this court, that of prejudgment interest pursuant to R.C. 1343.03(C).

## III. STANDARD OF REVIEW

{¶ 9} R.C. Chapter 1343 addresses the computation of interest when the rate is not stipulated. Specifically, R.C. 1343.03(C) provides the following, pertaining to prejudgment interest:

"(C) Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

{¶ 10} In interpreting R.C. 1343.03(C), the Ohio Supreme Court has explained that the statute was enacted "to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting." *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 495 N.E.2d 572. According to the Supreme Court, the statute requires all parties to make an honest effort to settle a particular case. Moreover, a party

---

**2.** For the sake of judicial economy and brevity, the court hereby incorporates the lengthy summary included in its recent decision and entry overruling defendants' motion for judgment notwithstanding the verdict or for a new trial, or in the alternative, motion for remittitur, filed February 26, 2003.

may have "failed to make a good faith effort to settle" even when he or she has not acted in bad faith. Id.

{¶ 11} In its decision, the Ohio Supreme Court in *Kalain* set forth the modern standard with respect to whether a party has complied with R.C. 1343.03(C). The Supreme Court announced:

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." Id.

{¶ 12} Furthermore, the Ohio Supreme Court reasoned that if a party has a good-faith, objectively reasonable belief that he or she has no liability, that party is under no obligation to make a monetary settlement offer. Id.

{¶ 13} The modern application of prejudgment interest was extensively re-examined and elaborated on eight years later by the Supreme Court of Ohio in the seminal case of *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331. As a preliminary matter, the *Moskovitz* court formally recognized a longstanding common-law right to prejudgment interest, despite several previous decisions that failed to acknowledge the availability of such a right at common law. Id. at 657, 635 N.E.2d 331. In the words of the Supreme Court, the purpose of this right has historically been the concern that the injured party should be made whole, because if reparation for an injury is delayed for a long time by the wrongdoer, the injured party cannot be made whole unless the damages awarded include compensation, in the nature of interest, for withholding the reparation that ought to have been promptly made. Id. at 656, 635 N.E.2d 331. See, also, *Musisca v. Massillon Community Hosp.* (1994), 69 Ohio St.3d 673, 635 N.E.2d 358.

{¶ 14} Upon examining the components of R.C. 1343.03(C), the Supreme Court of Ohio in *Moskovitz* instructed that the purpose of the statutory right to prejudgment interest is "to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy." Id. at 657–658, 635 N.E.2d 331, relying on *Peyko v. Frederick* (1986), 25 Ohio St.3d 164, 167, 25 OBR 207, 495 N.E.2d 918. In order for a moving party to meet the requirements of the statute, the decision on prejudgment interest rests squarely with the court, not the jury. Moreover, the trial court is obligated to hold a hearing on the motion for prejudgment interest.

{¶ 15} In attempting to further clarify the four requirements of R.C. 1343.03(C), as recognized in *Kalain*, the *Moskovitz* court stated the following:

"[T]o award prejudgment interest, the court must find that the party required to pay the judgment failed to make a good faith effort to settle and, fourth, the court must find that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case. R.C. 1343.03(C). The statute uses the word 'shall.' Therefore, if a party meets the four requirements of the statute, the decision to allow or not allow prejudgment interest is not discretionary. What is discretionary with the trial court is the determination of lack of good faith." Id. at 658, 635 N.E.2d 331.

{¶ 16} In addition, the Ohio Supreme Court recognized the inherent difficulty with the scope of discovery in proceedings for prejudgment interest. After considering the purposes of R.C. 1343.03(C), R.C. 2317.02, and Civ. R. 26, the Supreme Court in *Moskovitz* set forth the following guidance with respect to discovery vis-à-vis the attorney-client privilege:

"With these principles in mind, it is clear that statements, memoranda, documents, etc. generated in an attorney-client relationship tending to establish the failure of a party or an insurer to make a good faith effort to settle a case contrary to the purposes of R.C. 1343.03(C) are not protected from discovery in an R.C. 1343.03(C) proceeding for prejudgment interest. Stated otherwise, if, through the lack of a good faith effort to settle, the purposes of R.C. 1343.03(C) have been thwarted by a party and/or the attorneys involved in the case, a search for the truth of that fact cannot be hindered by claims of attorney-client privilege. Documents and other things showing the lack of a good faith effort to settle by a party or the attorneys acting on his or her behalf are wholly unworthy of the protections afforded by any claimed privilege.

"As we have stated, the purpose of R.C. 1343.03(C) is to encourage good faith efforts to settle a case outside the trial setting. The focus of an R.C. 1343.03(C) post-trial hearing for prejudgment interest must be the *pretrial* settlement efforts made between the plaintiffs and defendants and/or their insurers. Often, the only way for a party to prove another party's failure to make a good faith effort to settle is by obtaining the claims file of an insurer. However, the attempt to do so is often met by defense objections to the discoverability of matters contained within the file on the basis of work product or attorney-client privilege. If access to the file or matters contained therein is denied on the basis of privilege, the hearing required under R.C. 1343.03(C) may amount to nothing less than a retrial of the entire case." (Emphasis sic.) Id. at 661, 635 N.E.2d 331.

{¶ 17} Furthermore, the Supreme Court limited the definition of "privileged communication" in the context of R.C. 1343.03(C) to only those attorney-client communications contained in an insurer's claims file that go directly to the theory

of defense; privileged communications are to be excluded from discovery. Id. at 662, 635 N.E.2d 331.

{¶ 18} The Tenth District Court of Appeals has clarified that in examining the merits of a claim for prejudgment interest, any reliance by either party on the hindsight of the amount of the actual verdict returned by the jury in an action is of minimal value when it comes to evaluating good-faith efforts to settle. In *Smith v. Ruben* (Aug. 16, 2001), Franklin App. No. 00AP–1320, 2001 WL 921318, the Court of Appeals for Franklin County opined the following:

"The mere fact that a jury verdict is or is not close to settlement figures is at best, circumstantial evidence of the reasonableness of a party's evaluation of that case. *Hughes v. Brogan* [Ohio App. LEXIS 4302] (Sept. 26, 1995), Franklin App. No. 95APE02–153, unreported [1995 WL 571895]. As stated in *Black v. Bell* (1984), 20 Ohio App.3d 84 [20 OBR 105], 484 N.E.2d 739: 'The statute [R.C. 1343.03(C)] affords no remedy, nor does it deny a remedy, because one or both parties predict or fail to predict the ultimate verdict accurately. * * * At most, the proximity of one party's settlement offer to the ultimate verdict is conceivably some circumstantial evidence of the reasonableness of that party's evaluation. It falls far short of demonstrating that such party made a good faith effort to settle or that the adverse party failed to do so.' "

{¶ 19} The constitutionality of R.C. 1343.03(C) has been challenged at the appellate level in Ohio, primarily on the grounds that it infringes upon a party's right to a jury trial. However, Ohio courts have consistently overruled such challenges and upheld the constitutionality of the statute. *Kalain*, supra, 25 Ohio St.3d at 160, 25 OBR 201, 495 N.E.2d 572; *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 644 N.E.2d 298; *Edgerson v. Cleveland Elec. Illum. Co.* (1985), 28 Ohio App.3d 24, 28 OBR 34, 501 N.E.2d 1211; *Mills v. Dayton* (1985), 21 Ohio App.3d 208, 21 OBR 222, 486 N.E.2d 1209; *Hardiman v. Zep Mfg. Co.* (1984), 14 Ohio App.3d 222, 14 OBR 250, 470 N.E.2d 941.

{¶ 20} When faced with a motion for prejudgment interest predicated on R.C. 1343.03(C), the decision as to whether a party's settlement efforts indicate good faith is generally within the trial court's sound discretion. *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 615 N.E.2d 1022; *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 19 OBR 123, 482 N.E.2d 1248; *Felden v. Ashland Chem. Co., Inc.* (1993), 91 Ohio App.3d 48, 631 N.E.2d 689. The standard of review, therefore, is that of abuse of discretion, signifying that a trial court's decision will not be disturbed absent evidence of its being unreasonable, unconscionable, or arbitrary.

{¶ 21} The materials proper for the trial court to consider in reaching its decision on prejudgment interest are not limited to the evidence presented at the prejudgment interest hearing. The court may also review the evidence presented at trial, as well as its prior rulings and jury instructions, especially when considering such factors as the type of case, the injuries involved, applicable law, and the available defenses. *Galmish v. Cicchini* (2000), 90 Ohio St.3d 22, 27, 734 N.E.2d 782. Courts have further allowed the trial court to rely on its familiarity with the proceedings in the underlying action, its involvement with the parties' settlement negotiations, and the assessment of the credibility of witnesses during the prejudgment interest hearing. *Galvez v. Thomas F. McCafferty Health Ctr.*, Cuyahoga App. No. 80260, 2002-Ohio-2719, 2002 WL 1160204.

## IV. ARGUMENTS, ANALYSIS AND FINDINGS

### A. PLAINTIFF'S ARGUMENTS

{¶ 22} Plaintiff seeks prejudgment interest as allowed under R.C. 1343.03(C), as well as any other relief that the court deems equitable and appropriate.

{¶ 23} Plaintiff contends that on September 23, 1997, she presented herself to Dr. Cahill, who failed to follow the standard of care, resulting in serious injuries, including complete loss of vision in one eye and severe loss of vision in the other eye. According to plaintiff, she, through her attorney, made good-faith offers to settle this case with defendants prior to trial. However, it is plaintiff's position that defendants failed to engage in good-faith negotiations in order to settle this case and prevent the waste of judicial resources.

{¶ 24} Plaintiff asserts that defendants failed to respond to plaintiff's attempts to settle by letter, which offered a possible compromise. Plaintiff submits that defendants offered unreasonable settlement proposals of $75,000 and $125,000 to settle this case. Moreover, plaintiff highlights the fact that the evidence shows that plaintiff suffered serious injuries, loss of vision, as a direct and proximate result of the defendants' negligence. Consequently, plaintiff alleges that defendants failed to act in good faith by making a final offer of $125,000, when they had $4,000,000 in combined coverage. Furthermore, plaintiff states that she and counsel have complied with all discovery requests by defendants, or any other parties.

{¶ 25} Last, plaintiff insists that defendants in this action exercised what can only be characterized as "bad faith" when they failed to meaningfully negotiate. Plaintiff recognizes that although bad faith is not a prerequisite under *Moskovitz*, the facts in this case clearly demonstrate that bad faith was present on the part of defendants. It is plaintiff's contention that rather than pursuing a settlement

with plaintiff, defendants relied upon a faulty theory that plaintiff's own negligence was responsible for all of her injuries.

{¶ 26} Based upon the foregoing, plaintiff requests that the court assess prejudgment interest against defendants at a rate of 10 percent per annum from September 23, 1997.[3]

## B. DEFENDANTS' ARGUMENTS

{¶ 27} In response, defendants maintain that plaintiff failed to establish the required elements for prejudgment interest under Ohio law and that the court must deny plaintiff's motion for prejudgment interest.

{¶ 28} As a preliminary matter, defendants allege that plaintiff herself fails to establish that she made a good-faith effort to settle this action. According to defendants, plaintiff cannot merely rely on her own subjective claims of good faith to satisfy this requirement. Moreover, defendants claim that plaintiff has not objectively established that she did not fail to make a good faith effort to settle in light of the factors set forth by the Ohio Supreme Court.

{¶ 29} Specifically, defendants assert that plaintiff unnecessarily delayed the proceedings and discovery in this matter by waiting until two months before trial before conveying to defendants plaintiff's intent to call Dr. Asseff as an expert witness. Furthermore, defendants contend that plaintiff failed to make a timely settlement demand or to aggressively pursue settlement, as required under Ohio law. In contrast, defendants insist that it was counsel for defendants who consistently moved this case forward.

{¶ 30} As a separate matter, defendants further contend that they *did* negotiate in good faith. Defendants state that plaintiff has not come forward with any evidence establishing that defendants' $125,000 offer to settle, in response to the second demand of $400,000, was not in good faith. Moreover, defendants claim that they objectively considered the nature of the case and the injuries involved, as well as their defenses and the applicable law before offering $125,000. Defendants submit that examples of such considerations include (1) the fact that plaintiff's own experts agreed that plaintiff herself was substantially negligent in failing to follow the treatment plan prescribed by Dr. Cahill, (2) plaintiff's failure to seek followup treatment with Dr. Cahill for nearly nine months, and (3) the fact that no expert could quantify, with sufficient certainty, the actual percentage of vision plaintiff would have retained absent defendants' alleged negligence.

---

3. The court further incorporates into plaintiff's arguments the oral summation delivered by counsel for plaintiff at the conclusion of the hearing on prejudgment interest.

{¶ 31} Defendants caution the court that in addition to the fact that the $125,000 was objectively reasonable, the final amount of the verdict is irrelevant for purposes of determining whether these defendants negotiated in good faith. In further support, defendants submit that plaintiff's limited pretrial settlement negotiations demonstrate that counsel for plaintiff himself valued this case as close to the final offer extended by defendants. Moreover, plaintiff ultimately accepted $25,000 in settlement from the other four co-defendants, despite the fact that plaintiff's expert said that all four physicians had also breached the standard of care. Given all these considerations, defendants assert that throughout the three years this matter remained pending, they defended this matter, as well as negotiated, in good faith.

{¶ 32} Based on the foregoing, defendants request that the court deny plaintiff's motion for prejudgment interest.[4]

## C. ANALYSIS AND FINDINGS OF THE COURT

{¶ 33} It is now incumbent upon the court to apply the well-delineated standards set forth under R.C. 1343.03(C), and further articulated by the Ohio Supreme Court, to the above-styled action.

{¶ 34} In arriving at its decision, the court considered the following in reaching its conclusions: (1) the evidence presented by the parties at trial, (2) the court's previous rulings in this action, (3) the evidence and argument submitted during the proceeding for prejudgment interest, and (4) the court's own independent recollection of representations by counsel that took place in its presence.

{¶ 35} The first element for consideration under R.C. 1343.03(C), as enumerated by the Ohio Supreme Court in *Kalain,* and further reinforced in *Moskovitz,* concerns the level of cooperation in discovery, with the primary focus being on any dilatory tactics displayed by defendants.

{¶ 36} Upon review, the court finds that defendants in this case, as well as plaintiff, fully cooperated in discovery proceedings as contemplated by R.C. 1343.03(C).

{¶ 37} The instant matter has been advocated and adjudicated by competent and experienced trial counsel on both sides. An examination of the lengthy record in this case reveals a general lack of pretrial motions concerning discovery and/or contention arising in matters of discovery. Moreover, the court distinctly recalls the dialogue and exchange that took place between counsel during the various status conferences and at the final pretrial conference on January 25,

---

4. The court further incorporates into defendants' arguments the oral arguments delivered by counsel for defendants at the conclusion of the hearing on prejudgment interest.

2002.[5] Presently, the court finds it reasonable to conclude that any minor difficulties that the parties encountered in the course of discovery played no significant role with respect to the parties' ability the negotiate toward a possible resolution of plaintiff's claims.

{¶ 38} From the time this case was initiated, counsel made no mention of any significant failure to complete discovery resulting in prejudice to their respective trial preparation. Furthermore, the bulk of the January 26, 2001 final pretrial conference before the court concentrated on the efforts by plaintiff to attempt to reduce the window of plaintiff's treatment by defendants to post-September 24, 1997, which the court ultimately disallowed, as well as defense counsel's position on the issues of proximate cause and comparative negligence.

{¶ 39} The crux of this court's inquiry when examining cooperation in discovery is to assure that the parties were not deprived of information necessary to make a well-informed decision with respect to settlement. For instance, the Tenth District Court of Appeals recently affirmed a trial court's finding of prejudgment interest when defendants in that case failed to answer interrogatories filed with the complaint, failed to file a witness disclosure statement, failed to identify and disclose expert witnesses, and failed to appear at a court-ordered settlement conference. *Smith v. Ruben*, supra, at 3.

{¶ 40} The Court of Appeals for Franklin County in *Smith v. Ruben* agreed that the defendants' utter failure to cooperate in discovery "ultimately denied plaintiff the benefit of well-informed defendants who would be more capable of evaluating risks of going to trial and ultimate liability, thereby reducing or eliminat[ing] exhaustive and expensive trial preparation for both parties, not to mention saving court resources and time." Id.

{¶ 41} While it is true that plaintiff in this action vacillated regarding the prospect of calling Dr. Asseff as an expert witness on behalf of plaintiff, the court observes that this doctor was timely listed on plaintiff's disclosure of witnesses. In addition, despite some minor schedule shuffling several weeks before trial, Dr. Asseff was duly deposed by defendants with ample time remaining for consideration of settlement. Although less than ideal, the court has readily observed that in cases where substantial injuries are alleged, parties often avail themselves to serious settlement negotiations only in the several weeks immediately before trial.

---

5. Ironically, although this court has over 600 active cases at any given time and said pretrial conference took place well over a year ago, the conversations of that date are indelibly fixed in the court's memory based on a series of fanciful hypothetical situations created by plaintiff's counsel, culminating with the image of an unfortunate individual choking on a steak in his physician office, whereupon the doctor refuses to come to his patient's rescue.

{¶ 42} The testimony offered at the hearing on prejudgment interest is consistent with the court's finding. Despite the fact that defendants assert in their memorandum contra that plaintiff was late in disclosing the fact that she intended to call Dr. Asseff as an expert, the testimony that took place during the hearing does not suggest any resulting prejudice.

{¶ 43} An examination of the testimony of defendants' primary witness in the proceeding for prejudgment interest suggests that the parties equally cooperated in discovery. During his videotaped deposition, Gerald L. Draper testified as follows:

"A. I saw no evidence that there was any failure to cooperate in discovery.

"Q. Similarly, did you, based on the documents that you have reviewed, and again, based on your training and experience, reach an opinion as to whether or not, either Dr. Cahill, his medical corporation, or Enders had not attempted in cooperating in the delay – excuse me, had not unnecessarily delayed any of the proceedings in this case prior to trial? First, did you reach an opinion?

"A. Yes, I did.

"Q. And what was that opinion?

"A. I saw no evidence that anybody delayed the trial. In fact, it looks like its was a March '99 filing, and as you know, med mal case, in Franklin County are put on a two-year track. It was tried in the year 2002, but I think the reasons it was tried the following year were by mutual agreement or through the need for further time for discovery. It wasn't because anybody was delaying the process." Transcript, testimony of Gerald L. Draper, at 36–37.

{¶ 44} This court concludes that this is not an instance where the parties utilized stall tactics or created significant delays in producing discovery in order to preclude meaningful negotiations. Instead of any such strategy based on attrition, the parties' bargaining power or leverage in settlement negotiations stemmed primarily from their beliefs and confidence in their respective positions.

{¶ 45} The second factor in evaluating whether a party failed to make "a good faith effort to settle" addresses the critical element of whether that party conducted a rational evaluation of the risks and potential liability.

{¶ 46} After a thorough and complete review, the court determines that defendants in the matter sub judice failed to conduct a rational evaluation of the risks and potential liability associated with this case.

{¶ 47} As a preliminary observation, the court recognizes that it is common practice in medical malpractice cases for the insurance adjuster and defense counsel to work together and collaborate on an evaluation of the risks and potential liability of a claim, along with the likelihood of success at trial, or in the context of a pretrial dispositive motion. Several of the witnesses at the hearing

further indicated that a longstanding relationship or rapport between the two individuals can serve as an asset when it comes to evaluating a case and its respective defenses. However, the case authority is equally clear that the insurance adjuster maintains an independent duty to evaluate the risks and potential liability for the claim upon which he or she is assigned, and is the ultimate decisionmaker regarding settlement. *Basil v. Wagoner* (Sept. 12, 1995), Franklin App. Nos. 94APE12–1716 and 94APE12–1792, 1995 WL 546889. Furthermore, in the process of evaluating the risks and potential liabilities of a claim, an adjuster is obligated to review objectively the necessary medical records, deposition testimony, and evaluation from the medical doctors and attorneys. *Detelich v. Gecik* (1993), 90 Ohio App.3d 793, 630 N.E.2d 771. In *Detelich*, the court of appeals concluded that it was improper for the adjuster in that case to ignore relevant evidence and rely exclusively on his own judgment, which considered only the inherent uncertainty and expense of trial. Id. at 798, 630 N.E.2d 771.

{¶ 48} During the hearing on prejudgment interest, plaintiff called three witnesses to provide testimony in support of her motion. The first, John Lancione, an attorney with considerable expertise in medical malpractice cases, attested as follows:

"A. My opinion is that [Harrison] failed to exercise good faith, and they failed to rationally evaluate the risk and potential liabilities in the case, and the foundation of my inquiry is the Moskovitz case.

"* * *

"Q. Do you believe that if—if you were to say we're going to evaluate this case and it shouldn't settle for more than $150,000.00, do you believe that that was a rational evaluation of the risk as risk and damages in this case?

"A. No.

"Q. Why?

"A. Well, because you have got good liability; you have got proximate cause; you have got a very weak or nonexistent case of comparative negligence. You have got a woman who is blind in one eye and can hardly see out another. An evaluation of $150,000.00, in my view, is totally irrational.

"Q. Is it lacking in good faith, then, this Moskovitz standard?

"A. As an offer?

"Q. No, as that's the highest you will go.

"A. In [sic] think it's lacking in good faith to act on that irrational conclusion." Transcript, testimony of John Lancione, at 7, 23–24.

{¶ 49} The court further recalls former Supreme Court Justice Craig Wright opining that Harrison failed to fulfill his initial duty to investigate this claim and

that he "breached abysmally" his duty to perform an evaluation of the risks and potential liability. Similarly, John Heary stated the following in his testimony at the hearing:

"Q. Heary, did you, in this case, look at the activities of Harrison and draw any opinions concerning whether his handling of this case in both the evaluation of risk and liability and his handling of assessment of damages and the authority that extended in the negotiations that incurred [sic] thereafter were lacking in good faith?

"A. Yes, they were

"* * *

"Q. I will say Harrison only, $150,000.00 authority, based on that, was he acting in good faith in reasonably evaluating exposure of liability of damages?

"A. That was not acting in good faith.

"Q. Now, if Harrison wanted to seek additional authority in the case, what was your understanding he would have to do?

"A. It is my understanding that if he sought more than $200,000, he would have to go to a higher level of management.

"Q. Would rationale have to be given?

"A. Yes.

"Q. And do you have an opinion as to whether or not he should have consulted with his supervisor in this case?

"A. Yes.

"Q. What is that opinion?

"A. He should have.

"Q. Why?

"A. The uniqueness of the case with liability and damages issues and the communications from defense counsel that I read was continually giving me warning signs as depositions were unfolding, particularly plaintiff's depositions, and it was a basis for him to seek counseling, seek management counseling." Transcript, testimony of John Heary, at 30, 43–44.

{¶ 50} In response, defendants called Gerald L. Draper to provide testimony on their behalf and in opposition to an award of prejudgment interest. Upon being asked whether defendants and counsel rationally evaluated the risks and potential liability, Draper responded that Warren Enders "made a rational evaluation of the risks and of the value of the—the settlement value of the case." Transcript, testimony of Gerald L. Draper, at 44–45. However, Draper made one interesting concession during his videotaped deposition. When asked on cross-examination

concerning the prospects of defendants' prevailing on liability at trial, Draper stated the following:

"Q. All right. Now based upon your review of this case, and the evidence that you looked at that would be available to both sides prior to the trial, it was your opinion that there would be a jury verdict in favor of the plaintiff with some contributory negligence attached to that?

"A. Yes.

"* * *

"Q. It was—I believe it was your opinion, when I took your deposition, that there was a very high probability of that which did happen.

"A. Of—not the verdict.

"Q. Yes. Not the actual number of the verdict, but the liability and the contributory negligence.

"A. I would agree with that. I think plaintiff had a higher percentage of chance.

"Q. Okay. Any [sic] your opinion was, in this case, that the plaintiff—your opinion would have been, had you reviewed this case prior to trial, that the plaintiff would probably win, but it would be reduced to some extent for contributory negligence?

"A. Right." Transcript, testimony of Gerald L. Draper, at 71–73.

{¶ 51} Consequently, the court notes that there is a notable absence of disagreement among the independent witnesses that testified at the hearing on prejudgment interest with respect to the likelihood of plaintiff's success at trial. The general consensus was that plaintiff would more likely than not prevail, although there is a variance in opinion with respect to the additional elements of plaintiff's comparative negligence and damages.

{¶ 52} In a number of cases involving requests for prejudgment interest, courts have declined to award prejudgment interest due to the fact that the evidence supports a finding that the defendants had a good-faith and honest belief that their case was defensible. See *Russell v. Corbin* (Dec. 9, 1999), Cuyahoga App. Nos. 74939 and 75236, 1999 WL 1129076; *Loder v. Burger* (1996), 113 Ohio App.3d 669, 681 N.E.2d 1357. However, the Eleventh District Court of Appeals in *Loder v. Burger* gave the following admonition:

"A party holding an objectively unreasonable belief in non-liability is not excused from the obligation to enter into settlement negotiations, and cannot insulate himself from liability for prejudgment interest by relying on his own naiveté." Id. at 675, 681 N.E.2d 1357.

{¶ 53} Upon review, this court determines that the testimony offered at the hearing on prejudgment interest in this action suggests that the instant matter

does not fall into the category encountered in *Russell v. Corbin,* and that any belief by defendants that this was a case where they would more than likely prevail at trial was not objectively made or reasonably based on the evidence.

{¶ 54} An examination of the hearing testimony of Tim Harrison, the single adjuster at Medical Protective assigned to plaintiff's claim against defendants, proves to be especially significant to the court in its evaluation of second factor required under R.C. 1343.03(C).

{¶ 55} During his testimony at the hearing on prejudgment interest, Harrison testified with respect to several pieces of information, which, taken together, demonstrate a lack of familiarity with plaintiff's claims against defendants. To begin, Harrison displayed a lack of appreciation for the specific extent of vision loss to each of plaintiff's eyes, a fact that the court considers to be crucial considering the nature of plaintiff's claims, as well as the potential for considerable damages. Transcript, testimony of Timothy Harrison, at 18–22. Second, when asked about the letter written by Dr. Cahill to Dr. Morris on September 24, 1997, Harrison did not have even a recollection of the letter or its potential to influence jurors at trial. Specifically, Harrison testified as follows:

"Q. At the time I took your deposition, you knew from where you are from your memory there was nothing in the office chart about the refusal, right?

"A. Yes.

"Q. And then when I showed you the letter, you said you didn't recall ever seeing the letter, no. Those were your words, were they not? Answer, 'I don't specifically recall seeing that letter, no.'

"A. I'm sure if that's what I said, that's what I said.

"Q. So, as you sit here today, you cannot testify under oath that you ever saw the letter because you don't remember seeing it?

"A. I can testify that it was part of the record that I had in my possession. I reviewed the letter on multiple occasions; therefore, I can testify that I am certain that I saw the letter.

"Q. But it apparently did not make an impression on you such as to then cause you to think that it had any significance to the case dealing with the refusal issue; is that your testimony?

"A. Did I believe it was a smoking gun as you characterized earlier? No.

"Q. It apparently did not make enough of an impression on you to cause you to remember it, right?

"A. One might come to that conclusion." Transcript, testimony of Timothy Harrison, at 34–35.

{¶ 56} The court determines that even if Harrison firmly believed Dr. Cahill's representations as to plaintiff's refusal to allow the shunt procedure, he should

have at least registered the letter's significance and threatening potential to influence jurors negatively with respect to defendants' credibility.

{¶ 57} In addition, the claims file itself, which Harrison is ultimately responsible for and presumably the author thereof, is riddled with a stream of advice from defense counsel Warren Enders indicating that defendants were faced with a number of unsettling concerns with respect to the prospect of trial. Specifically, on October 26, 2000, Enders stated to Harrison that plaintiff's attorney did "cause me some concern in defending this matter." In a subsequent letter, dated November 21 2001, Enders conveyed the following:

"For a patient with significant disability, as Ms. Watson has, juries will be sympathetic and may not be willing to assess negligence against the patient. There is potential that the jury could agree to award this Plaintiff a substantial sum, for a loss of almost all her vision in her left eye."

{¶ 58} On December 28, 2001, Enders actually warned Harrison that "this is a case best settled if we can get it reasonably."

{¶ 59} The combination of an extremely sympathetic plaintiff and the severe and permanent injury of blindness should have caused an alarming degree of concern to Harrison. Courts have found that in matters whereby harrowing results or outcomes occur, defendants cannot ignore the factor of sympathy that such matters tend to evoke from a jury. *Wurts v. Gregg* (July 13, 2001), Montgomery App. No. 18677, 2001 WL 788005.

{¶ 60} As this court has stated earlier, plaintiff in this action lost nearly all of a most valued commodity—her vision. Despite all of these compelling factors, Harrison never sought authority from his regional manager to increase his authority in excess of $200,000. Furthermore, the evidence demonstrates that Harrison never increased even his own discretionary authority to settle this claim over $150,000.00, in spite of the fact that it was even suggested by counsel that such an offer might successfully resolve the litigation.

{¶ 61} From the court's perspective, the serious nature of the comments from defense counsel, along with the substantive information contained in the claims file, should have set off a series of red flags to Harrison. The court does not think it is a stretch to conclude that, at a minimum, the adjuster should have been on the phone, or on his computer as he testified during the hearing, requesting additional authority in excess of $200,000 from his regional manager. The fact that Harrison did not extend to plaintiff even the amount already authorized, $150,000, is a blatant example of his improper evaluation of the risks and potential liability regarding this claim.

{¶ 62} Upon consideration of all of the evidence, with particular emphasis on the claims file introduced as an exhibit during the hearing on prejudgment

interest, the court, in its role as the finder of fact, concludes that the testimony of Harrison, to any extent that he claims he rationally evaluated the risks and potential liability of this claim, lacks credibility and is in direct conflict with the evidence produced at said hearing. Moreover, the court finds with respect to defendants' evaluation and investigation, the evidence leads to the inescapable conclusion that Harrison mishandled plaintiff's claim.

{¶ 63} The court further concludes that the basis for Harrison's conduct with respect to plaintiff's claim can only be described as an over reliance on the abilities of Warren Enders. While it is true that defense counsel in this case offered vast trial experience in medical malpractice cases, such impressive qualifications should not have been used by Harrison as a complete substitute for his recognized duty to independently evaluate plaintiff's claim based on the evidence in the claims file. The court finds that Harrison displayed a lack of familiarity with this case that is best explained by the fact that he perceived himself as blessed with an ace up his sleeve, the retention of a preeminent medical malpractice defense attorney, who at that time had never lost a case from the defense side, including four previous victories on ophthalmic medical malpractice cases while representing Med Pro. Transcript, testimony of Warren Enders, at 4–5. Presently, the court is only able to characterize such irrational reliance by Harrison as the byproduct of the type of arrogance, overconfidence, or excess hubris that R.C. 1343.03(C) was specifically enacted to protect against.

{¶ 64} Accordingly, the court finds that defendants are unable to satisfy the second recognized requirement under R.C. 1343.03(C).

{¶ 65} Third, under the guidance of *Kalain* and *Moskovitz,* the court is called upon to determine whether defendants at any time attempted to unnecessarily delay any of the proceedings.

{¶ 66} After a thorough review of the record of the matter sub judice, as well as the court's own independent recollection of the litigation, the court concludes that the evidence is entirely devoid of any significant act or inaction by any of the parties that can be characterized as "an unnecessary delay of the proceedings." Because the court has already concluded that the parties advanced discovery in a relatively orderly and timely manner, it will concentrate on any additional aspects of the litigation that may demonstrate "an unnecessary delay."

{¶ 67} The court observes that this action was filed on March 26, 1999, and placed under Case Category A, the category reserved for professional torts, which commands a two-year track on the court's docket. The date this case ultimately came before the court for trial was February 4, 2002. While this was not the original trial date, it was within one year of the trial date set in the case scheduling order. It is the court's recollection that the parties needed a small extension of time to complete discovery, especially in light of the fact that there

were originally seven parties in this case until shortly before trial when plaintiff reached a settlement with plaintiff's other treating physicians.

{¶ 68} What distinctly stands out in the court's memory was the fact that any extension of discovery and continuance of the original trial date were mutually agreed upon by all the parties without opposition. Overall, this case was tried by diligent counsel who properly responded to the sequence of litigation as dictated by the case scheduling order and the court's admonitions with respect to trial preparation. The parties and counsel were able to evaluate fully their respective positions. Despite the fact that settlement negotiations may have been bottom-heavy, taking place primarily during a period shortly before trial, the court does not find that any party was the victim of any unnecessary delay of the proceedings.

{¶ 69} Once again, defendants' own witness, Gerald L. Draper, substantiates the court's holding in this regard by failing to recognize any delay on the part of either defendants or plaintiffs. Transcript, testimony of Gerald L. Draper, at 36–37.

{¶ 70} As a result, it would be an unfair characterization to suggest that defendants attempted to delay unnecessarily any of the proceedings. At the same time, the court equally does not find that plaintiff attempted to delay unnecessarily any of the proceedings.

{¶ 71} The fourth and final factor recognized by the Supreme Court of Ohio focuses on whether the defendants made a good-faith monetary settlement offer or responded in good faith to a demand from plaintiff.

{¶ 72} Although such an inquiry appears rather straightforward, courts have found that for a proper examination of this requirement to occur, several separate and competing findings must be addressed. As submitted by defendants, settlement negotiations can be characterized as a two-way street, and if both parties neglected to act in good faith as to negotiations, their efforts, or lack thereof, can be found to be equivalent, thereby negating an award of prejudgment interest. *Earl Evans Chevrolet v. Gen. Motors Corp.* (1991), 74 Ohio App.3d 266, 289, 598 N.E.2d 1187. However, even if defendants believed plaintiff's demands to be high, they are not relieved of their burden to negotiate. *McMunn v. Mt. Carmel Health* (Apr. 30, 1998), Franklin App. No. 97APE05–643, 1998 WL 212853.

{¶ 73} After a thorough review of the evidence, the court makes the following observations with respect to offers made by the parties: (1) in a correspondence without a date received in December 2001, plaintiff made an initial demand of $500,000; (2) on December 28, 2001, defendants made an initial offer of $75,000, with conditional consent from Dr. Cahill; (3) in early January 2002, plaintiff

lowered her demand to $400,000; (4) shortly thereafter, defendants responded by offering $100,000; (5) during the January 25, 2002 final pretrial conference, plaintiff once again reduced her demand to $350,000, while defendants maintained their offer of $100,000; and (6) on the day of trial, defendants made a final offer of $125,000.

{¶ 74} Upon consideration in the matter sub judice, the court initially finds that good-faith monetary demands were made to. defendants by plaintiff. Formally speaking, plaintiff made three separate demands from defendants to settle this matter for $500,000, $400,000, and $350,000, respectively. Further indications from plaintiff's counsel suggest that plaintiff may have even settled for a sum substantially less. This position is stated in the correspondence dated February 8, 2002, wherein counsel for plaintiff memorializes that plaintiff has "room to move."[6]

{¶ 75} The existence of good faith by plaintiff is described in further detail by John Lancione through the following testimony:

"Q. Lancione, do you have an opinion as to that demand being made, whether or not the plaintiff fulfilled the obligations set forth in Moskovitz of making a good faith offer to settle the case?

"A. I would say it was excessively good faith or extremely good faith.

"* * *

"Q. * * * It came out in opening statement that there was a note from Warren on January 7, 2001 that says something to the effect that he needs $150,000.00 from me. And that was represented in opening statement that that was a demand by the plaintiff for $150,000.

"A. Assuming that to be true.

"Q. I am going to ask you to assume that hypothetical. And I am going to ask you to assume that, apparently, at that time, that the plaintiffs' attorney had $150,000 worth of authority at that time. If that occurred, what should have happened?

"A. They should have written a check for $150,000 and gone to church and thanked god for their good fortune." Transcript, testimony of John Lancione, at 29–30.

{¶ 76} Moreover, given the reasonableness of plaintiff's final demand of $350,000, the court finds that plaintiff did not fail to act in good faith by not

---

6. The court heard testimony at the hearing on prejudgment interest that confirmed that counsel for plaintiff had previously conveyed such a position to counsel for defendants by telephone.

negotiating against herself by unilaterally reducing her demand. See *Galmish v. Cicchini* (2000), 90 Ohio St.3d 22, 734 N.E.2d 782.

{¶ 77} Even Draper and Harrison concede in their testimony before the court that defendants' potential exposure was in excess of the $350,000.00 offer, not even considering the fact that counsel for plaintiff aggressively represented that plaintiff would have likely settled for less. Transcript, testimony of Timothy Harrison, at 17; Transcript, testimony of Gerald L. Draper, at 101. As a result, this court is quite certain that there are no facts in evidence that can refute that plaintiff extended numerous good-faith monetary demands.

{¶ 78} Equally, the court is unable to find or infer any evidence of "bad faith" on the part of defendants. Bad faith has been defined as "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Kalain,* 25 Ohio St.3d at 159, 25 OBR 201, 495 N.E.2d 572, citing *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315. Clearly, bad faith embraces an actual intent to mislead or deceive another.

{¶ 79} While the evidence before the court in this action reveals instances of artful deception by defendants and counsel, such occurrences are limited to a guarded failure to disclose their bottom line, puffery, and other tactics rightfully employed in the art of negotiation. Although such practices can often create confusion or muddy the waters of settlement discussions, the court interprets "bad faith" as involving a more nefarious motive or intent.

{¶ 80} Upon review of the evidence, the court finds no evidence whatsoever that either plaintiff or defendants engaged in "bad faith" in their settlement negotiations. Quite honestly, the court determines through its own independent research that cases that contain evidence of "bad faith" in this context are relatively rare and convert what the Ohio Supreme Court characterized in *Moskovitz* as a "complex question" into a relatively simple one, finding in favor of an award of prejudgment interest against the guilty party. The court is confident that although it would make short work of its consideration of the instant motion, this matter falls into the complex inquiry envisioned by *Moskovitz.*

{¶ 81} The more crucial determination the court must resolve in this action is whether defendants displayed "a lack of good faith to settle" in their monetary offers.

{¶ 82} After an exhaustive review of the evidence and substantial consideration, the court finds that defendants failed to make a good-faith monetary settlement offer or respond in good faith to numerous demands from plaintiff.

{¶ 83} All three of plaintiff's witnesses, Lancione, former Justice Craig Wright, and John Healy, unequivocally testified that defendants in their extension of the final offer of $125,000 failed to make a good-faith monetary offer, as required under R.C. 1343.03(C).

{¶ 84} It is somewhat difficult to objectively consider whether Harrison neglected to extend a good-faith monetary offer, because the court has already decided that he was negligent in his evaluation of the claim, which by its very nature suggests that any offer he extended was not based on a rational evaluation of the risks and liabilities. Nevertheless, the court observed that during the hearing on prejudgment interest, Harrison attested to the following:

"Q. And you felt that, at least orally, you believe, although it's not reported, that the potential—the jury potential was in the realm of $500,000?

"A. Yes." Transcript, testimony of Timothy Harrison, at 17.

{¶ 85} Based on such testimony, the court determines that Harrison's offers of $75,000, $100,000, and $125,000 do not constitute good faith monetary demands, even under his own evaluation of plaintiff's claim, which this court has previously concluded to be irrational.

{¶ 86} Perhaps the most compelling evidence before the court with respect to this element is the testimony of Gerald L. Draper, who once again offered an opinion in support of defendants. Despite the fact that Draper jumped through all of the necessary hoops with respect to this requirement in the four-pronged determination articulated under *Kalain* and *Moskovitz*, he rendered several opinions under cross-examination which were especially damning with respect to defendants' lack of good faith regarding their monetary settlement offers to plaintiff. Draper testified as follows:

"Q. Okay. Now I understand that at the time I took your deposition you may have had a limited understanding of the difference in her vision and may not have a clear understanding of it today, but when I took your deposition, you indicated that you would have advised the insurance carrier that this case would have a verdict in Franklin County in a range of [$750,000] to $800,000.

"A. A gross verdict potential, right.

"Q. And if your understanding of the damages was worse than what you understood it to be today, then that number would be higher?

"A. Well, my understanding was that she is virtually blind. In mean I don't know how much worse that can be, other than totally blind, I guess. But no, I was assuming some pretty bad facts on her current condition.

"Q. All right. And you felt that in this case, a 32 percent win, the actual verdict, I mean that was a big win for the defense?

"A. Yes.

"Q. So if you take the big win of 32 percent and you deduct that from the [$750,000] to $800,000 range that you attached, that would put you in the range of [$510,000] to $544,000 verdict after contributory negligence?

"A. If you did the math, yes." Transcript, testimony of Gerald L. Draper, at 36–37.

{¶ 87} As suggested infra, such testimony further reinforces the fact that defendants themselves should have envisioned losing with respect to liability at trial. Perhaps this ominous outcome was sensed by counsel for defendants, who consistently conveyed to Harrison an increasing concern with Defendants' potential exposure at trial and responded by advising Harrison that "this is a case best settled."

{¶ 88} Based on the irrefutable conclusions that can be deduced from the evidence, the court makes the following findings: (1) according to all of the independent witnesses' testimony, plaintiff had a better-than-even probability of prevailing at trial; (2) if plaintiff was successful, a net verdict in plaintiff's favor at a minimum would consist of $500,000; (3) according to defendants' own witness Gerald L. Draper, a finding of 32 percent comparative negligence constituted a large victory for the defendants, thereby suggesting it may have been less if defendants were not victorious in this respect; (4) Harrison himself acknowledged that defendants may have been exposed to a verdict in the neighborhood of $500,000; (5) the maximum offer by defendants was $125,000 and did not come until the morning of trial; and (6) all of plaintiff's demands were equal to or less than the range anticipated by the independent witnesses testifying at the hearing.

{¶ 89} After reconciling all of the evidence and testimony submitted by the parties, the court is unable, even under the most liberal definition of "a good faith monetary offer," to conclude that defendants' final offer of $125,000 meets the standard set forth by the Ohio Supreme Court in interpreting R.C. 1343.03(C). As a result, the court finds that defendants are unable to meet their obligations under the fourth recognized requirement enumerated by the Ohio Supreme Court.

{¶ 90} In summary, after an extensive review of the record and the evidence before the court, it is determined that defendants in this action failed to make "a good faith effort to settle" with plaintiff, as mandated by both R.C. 1343.03(C) and the Ohio Supreme Court in *Kalain* and *Moskovitz,* supra. Specifically, the court finds that defendants did not conduct a rational evaluation of the risks and potential liability, and further, failed to make a good faith monetary settlement offer or respond in good faith to numerous demands from plaintiff.

{¶ 91} Accordingly, after a thorough review of all of the evidence and argument presented by the parties, this court concludes that plaintiff's motion for prejudg-

ment interest against defendants is well founded. Consequently, the court hereby sustains plaintiff's motion for prejudgment interest against Defendants.

## V. CONCLUSION

{¶ 92} Based on the foregoing, the court hereby sustains plaintiff's motion for prejudgment interest against defendants.

{¶ 93} The court hereby orders defendants to compensate plaintiff with an award of prejudgment interest, in addition to the $5.85 million net verdict awarded by the jury, calculated at a rate of 10% per annum from September 23, 1997.

{¶ 94} Civ.R. 58(B) provides the following:

"(B) Notice of filing. When the court signs a judgment, the court shall endorse thereon a direction to the clerk to serve upon all parties not in default for failure to appear notice of the judgment and its date of entry upon the journal. Within three days of entering the judgment on the journal, the clerk shall serve the parties in a manner prescribed by Civ. R. 5(B) and note the service in the appearance docket. Upon serving the notice and notation of the service in the appearance docket, the service is complete. The failure of the clerk to serve notice does not affect the validity of the judgment or the running of the time for appeal except as provided in App. R. 4(A)."

{¶ 95} The court finds that there is no just reason for delay. This is a final appealable order. The clerk is instructed to serve the parties in accordance with Civ.R. 58(B) as set forth above.

Prejudgment interest granted.